UNITED STATES *v.* BARNETT ET AL.

No. 107.  Argued October 21–22, 1963.—Decided April 6, 1964.

*Solicitor General Cox* and *Leon Jaworski* argued the cause for the United States.   With them on the brief were *Assistant Attorney General Marshall, Louis F. Claiborne, Harold H. Greene* and *David Rubin.*

*Malcolm B. Montgomery* and *Charles Clark,* Special Assistant Attorneys General of Mississippi, argued the cause for defendants.   With them on the brief were

*Joe T. Patterson,* Attorney General, *Dugas Shands,* Assistant Attorney General, and *Garner W. Green, Joshua Green, M. M. Roberts* and *Fred B. Smith,* Special Assistant Attorneys General.

Briefs of *amici curiae* in support of the defendants were filed by *Joe T. Patterson,* Attorney General of Mississippi, for the State of Mississippi, and by *Osmond K. Fraenkel, Norman Dorsen* and *Melvin L. Wulf* for the American Civil Liberties Union.

MR. JUSTICE CLARK delivered the opinion of the Court.

This proceeding in criminal contempt was commenced by the United States upon the specific order, *sua sponte,* of the Court of Appeals for the Fifth Circuit. Ross R. Barnett, Governor of the State of Mississippi at the time this action arose,[1] and Paul B. Johnson, Jr., Lieutenant Governor, stand charged with willfully disobeying certain restraining orders issued, or directed to be entered, by that court. Governor Barnett and Lieutenant Governor Johnson moved to dismiss, demanded a trial by jury and filed motions to sever and to strike various charges. The Court of Appeals, being evenly divided on the question of right to jury trial, has certified the question[2] to this Court under the authority of 28 U. S. C. § 1254 (3). 330 F. 2d 369. We pass only on the jury issue and decide that the

---

[1] On January 21, 1964, Governor Barnett's term of office expired and Lieutenant Governor Johnson became Governor.

[2] "Where charges of criminal contempt have been initiated in this Court of Appeals against two individuals, asserting that such individuals willfully disobeyed a temporary restraining order of the Court, which order was entered at the request of the United States, acting as amicus curiae pursuant to its appointment by an order of the Court which granted to it, among other rights, the right to initiate proceedings for injunctive relief, and the acts charged as constituting the alleged disobedience were of a character as to constitute also a criminal offense under an Act of Congress, are such persons entitled, upon their demand, to trial by jury for the criminal contempt with which they are charged?"

alleged contemners are not entitled to a jury as a matter of right.

The proceeding is the aftermath of the efforts of James Meredith, a Negro, to attend the University of Mississippi. Meredith sought admission in 1961 and, upon refusal, filed suit in the United States District Court for the Southern District of Mississippi. That court denied relief, but the Court of Appeals reversed and directed the District Court to grant the relief prayed for. *Meredith* v. *Fair*, 305 F. 2d 343. The mandate was stayed by direction of a single judge of the Court of Appeals, whereupon, on July 27, the Court of Appeals set aside the stay, recalled the mandate, amended and reissued it, including its own injunctive order "enjoining and compelling" the Board of Trustees, officials of the University and all persons having knowledge of the decree to admit Meredith to the school. On the following day the Court of Appeals entered a separate and supplemental "injunctive order" directing the same parties to admit Meredith and to refrain from any act of discrimination relating to his admission or continued attendance. By its terms, this order was to remain in effect "until such time as there has been full and actual compliance in good faith with each and all of said orders by the actual admission of [Meredith] . . . ." After a series of further delays, the District Court entered its injunction on September 13, 1962, directing the members of the Board of Trustees and the officials of the University to register Meredith.

When it became apparent that the decrees might not be honored, the United States applied to the Court of Appeals on September 18 for permission to appear in the Court of Appeals in the case. This application was granted in the following terms:

> "IT IS ORDERED that the United States be designated and authorized to appear and participate as *amicus curiae* in all proceedings in this action before

this Court and by reason of the mandates and orders of this Court of July 27, 28, 1962, and subsequently thereto, also before the District Court for the Southern District of Mississippi to accord each court the benefit of its views and recommendations, with the right to submit pleadings, evidence, arguments and briefs and to initiate such further proceedings, including proceedings for injunctive relief and proceedings for contempt of court, as may be appropriate in order to maintain and preserve the due administration of justice and the integrity of the judicial processes of the United States."

Meanwhile, the Mississippi Legislature had adopted an emergency measure in an attempt to prevent Meredith from attending the University, but on September 20, upon the Government's application, the enforcement of this Act was enjoined, along with two state court decrees barring Meredith's registration. On the same day Meredith was rebuffed in his efforts to gain admission. Both he and the United States filed motions in contempt in the District Court citing the Chancellor, the Registrar and the Dean of the College of Liberal Arts. After a hearing they were acquitted on the ground that the Board of Trustees had stripped them of all powers to act on Meredith's application and that such powers were in Governor Barnett, as agent of the Board.

The United States then moved in the Court of Appeals for a show-cause order in contempt against the Board of Trustees, based on the order of that court dated July 28. An *en banc* hearing was held at which the Board indicated that it was ready to admit Meredith, and on September 24 the court entered an order requiring the Board to revoke its action appointing Governor Barnett to act as its agent. The order also required the Registrar, Robert B. Ellis, to be available on September 25 to admit Meredith.

On the evening of September 24, the United States filed an ancillary action to the *Meredith* v. *Fair* litigation seeking a temporary restraining order against the State of Mississippi, Governor Barnett, the Attorney General of Mississippi, the Commissioner of Public Safety and various lesser officials. This application specifically alleged that the Governor had implemented the State's policy of massive resistance to the court's orders, by personal action, as well as by use of the State's various agencies, to frustrate and destroy the same; that the Governor's action would result in immediate and irreparable injury to the United States, consisting of impairment of the integrity of its judicial processes, obstruction of the administration of justice and deprivation of Meredith's declared rights under the Constitution and laws of the United States. On the basis of such allegations and at the specific instance of the United States as the sole moving party and on its own behalf, the Court of Appeals issued a temporary restraining order at 8:30 a. m. on the 25th against each of these parties restraining them from performing specific acts set out therein and from interfering with or obstructing by any means its order of July 28 and that of the District Court of September 13. Thereafter the United States filed a verified application showing that on the afternoon of the 25th Governor Barnett, "having actual knowledge of . . . [the temporary restraining order], deliberately prevented James H. Meredith from entering the office of the Board of Trustees . . . at a time when James H. Meredith was seeking to appear before Robert B. Ellis in order to register . . . and that by such conduct Ross R. Barnett did wilfully interfere with and obstruct James H. Meredith in the enjoyment of his rights under this Court's order of July 28, 1962 . . . all in violation of the terms of the temporary restraining order entered by the Court this day." The court then entered a show-cause order in contempt against Governor Barnett requiring him to appear on Sep-

tember 28. On September 26, a similar order was issued against Lieutenant Governor Johnson requiring him to appear on September 29. On September 28, the Court of Appeals, *en banc* and after a hearing, found the Governor in civil contempt and directed that he be placed in the custody of the Attorney General and pay a fine of $10,000 for each day of his recalcitrance, unless he purged himself by October 2. On the next day Lieutenant Governor Johnson was found in contempt by a panel of the court and a similar order was entered with a fine of $5,000 a day.

On September 30, President Kennedy issued a proclamation commanding all persons engaged in the obstruction of the laws and the orders of the courts to "cease and desist therefrom and to disperse and retire peaceably forthwith." 76 Stat. 1506. The President also issued an Executive Order dispatching a force of United States Marshals and a detachment of the armed forces to enforce the court's orders. On September 30, Meredith, accompanied by the Marshals, was moved into a dormitory on the University campus and was registered the next day. Although rioting broke out, order was soon restored, with some casualties, and Meredith carried on his studies under continuous guard until his graduation.

On November 15, 1962, the Court of Appeals, *sua sponte,* appointed the Attorney General or his designated assistants to prosecute this criminal contempt proceeding against the Governor and Lieutenant Governor pursuant to Rule 42 (b) of the Federal Rules of Criminal Procedure. On application of the Attorney General, the Court of Appeals issued a show-cause order in criminal contempt based on the Court of Appeals' temporary restraining order of September 25, its injunctive order of July 28, and the District Court's order of September 13. It is out of this proceeding that the certified question arises.

As we have said, the sole issue before us is whether the alleged contemners are entitled as a matter of right to a

jury trial on the charges. We consider this issue without prejudice to any other contentions that have been interposed in the case and without any indication as to their merits.

## I.

The First Congress in the Judiciary Act of 1789 conferred on federal courts the power "to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same . . . ." 1 Stat. 83. It is undisputed that this Act gave federal courts the discretionary power to punish for contempt as that power was known to the common law. *In re Savin*, 131 U. S. 267, 275–276 (1889). In 1831, after the unsuccessful impeachment proceedings against Judge Peck,[3] the Congress restricted the power of federal courts to inflict summary punishment for contempt to misbehavior "in the presence of the said courts, or so near thereto as to obstruct the administration of justice," misbehavior of court officers in official matters, and disobedience or resistance by any person to any lawful writ, process, order, rule, decree, or command of the courts. Act of March 2, 1831, c. 99, 4 Stat. 487, 488. These provisions are now codified in 18 U. S. C. § 401 without material difference.[4] The Court of Appeals proceeded in this case under the authority of this section.

---

[3] See Nelles and King, Contempt by Publication in the United States, 28 Col. L. Rev. 401, 423–430.

[4] 18 U. S. C. § 401:

"Power of court.

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

"(2) Misbehavior of any of its officers in their official transactions;

"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

The alleged contemners claim, however, that the powers granted federal courts under § 401 were limited by the Congress in 1914 by the provisions of §§ 21, 22 and 24 of the Clayton Act, 38 Stat. 738–740, now codified as 18 U. S. C. §§ 402 and 3691. These sections guarantee the right to a jury trial in contempt proceedings arising out of disobedience to orders "of any district court of the United States or any court of the District of Columbia," provided that the conduct complained of also constitutes a criminal offense under the laws of the United States or of any State. But the Clayton Act further provides that the requirement of a jury does not apply to "contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States, but the same, and all other cases of contempt not specifically embraced in this section may be punished in conformity to the prevailing usages at law." 18 U. S. C. § 402. Rule 42 (b) of the Federal Rules of Criminal Procedure thereafter set down the procedural requirements for all contempt actions, providing that "[t]he defendant is entitled to a trial by jury in any case in which an act of Congress so provides."

We now proceed to a consideration of the claim of a right to trial by jury under these statutes and under the Constitution of the United States.

## II.

Governor Barnett and Lieutenant Governor Johnson first contend that the record clearly shows that the United States invoked the proceedings taken by the Court of Appeals and sought that court out as a source of orders, duplicating the orders obtained by the real party in interest in the District Court, solely for the purpose of by-passing the District Court and depriving them of their right to a jury. We find no evidence of this. Indeed,

the Court of Appeals granted injunctive relief only after it had jurisdiction over Meredith's appeal, after it had acted upon that appeal and after its order was being frustrated.

Next it is contended that the Court of Appeals had no jurisdiction in the matter since its mandate had been issued and the case had been remanded to the District Court.[5] On a certificate we do not pass on alleged irregularities in the proceedings in the court below, as such contentions are clearly premature.[6]

---

[5] In *Busby* v. *Electric Utilities Employees Union,* 323 U. S. 72, 75 (1944), we held that: "This Court will not answer a question which will not arise in the pending controversy unless another issue, *not yet resolved* by the certifying court, is decided in a particular way." (Emphasis supplied.) In the instant case the issue of right to jury trial is not simply a hypothetical and was squarely presented to the Court of Appeals after that court rejected, in the order of October 19, 1962, the contention that it lacked jurisdiction. While this Court denied the petition for writ of certiorari to review that order, *Mississippi* v. *Meredith,* 372 U. S. 916 (1963), and while the issue is not before us now, the Court would not be foreclosed from passing on the jurisdictional question if and when it is properly presented here after the trial on the merits.

[6] Interpreting the precursor of 28 U. S. C. § 1254 (3), this Court said in *Ward* v. *Chamberlain,* 2 Black 430, 434–435 (December Term, 1862): "Such certificate, as has repeatedly been held by this Court, brings nothing before this Court for its consideration but the points or questions certified, as required by the 6th section of the act. . . . [N]othing can come before this Court, under that provision, except such single definite questions as shall actually arise and become the subject of disagreement in the Court below, and be duly certified here for decision. *Ogle* vs. *Lee,* (2 Cran., 33); *Perkins* vs. *Hart's Exr.,* (11 Whea., 237); *Kennedy et al.* vs. *Georgia State Bank,* (8 How., p. 611.) All suggestions, therefore, respecting any supposed informality in the decree, or irregularities in the proceedings of the suit, are obviously premature and out of place, and may well be dismissed without further remark; because no such inquiries are involved in the points certified, and by all the decisions of this Court matters not so certified are not before the Court for its consideration, but

690

The alleged contemners next assert that § 402 is applicable. They urge that since § 402 gives a jury trial to those charged with contempt in "any court of the District of Columbia," this would include the Court of Appeals for the District of Columbia. They argue from this that the section must be construed to apply to all other Courts of Appeals to avoid manifest discrimination which the Due Process Clause of the Fifth Amendment prohibits and to comply with the Privileges and Immunities Clause of Art. IV, § 2 of the Constitution. We are not persuaded. At the time that the Clayton Act was adopted, the trial court of general jurisdiction in the District of Columbia was known as the "Supreme Court of the District of Columbia" rather than the United States District Court. Moreover, there were also inferior courts there known as the municipal and police courts and now called the "District of Columbia Court of General Sessions." Since none of these trial courts of the District would have been included in the designation "any district court of the United States," the insertion of "any court of the District of Columbia" was necessary to adapt the bill to the judicial nomenclature of the District of Columbia. It is hardly possible to suppose that the House, where this phrase was inserted without explanation, was somehow by this language reversing the decision to exclude appellate courts from the jury requirements.[7]

_____

remain in the Court below to be determined by the Circuit Judges. *Wayman* vs. *Southard*, (10 Whea., 21); *Saunders* vs. *Gould*, (4 Pet., 392.)"

[7] This is buttressed by an earlier statement of the sponsor of the bill at 48 Cong. Rec. 8778:

"The next criticism [of the former, rejected bill] was that it provided for contempt in courts where there were no jurors. We answered that by confining the operation in this bill to the circuit courts, to the courts where there are juries, and we exempt its operation in the courts of appellate jurisdiction. We met that criticism in that way. There has been none that I know of or little, if any, complaint made

This is shown by the legislative history of the bill when discussed in the Senate, 51 Cong. Rec. 14414, where it was made explicit that the bill "applies . . . only to orders of the district courts; contempts of orders of all other courts must be had as now."

Nor can we conclude from the record here that the show-cause order directed by the Court of Appeals to the alleged contemners must be construed as being founded upon violations of the District Court's injunction of September 13, entered upon the specific order of the Court of Appeals. The show-cause order specifies that three injunctions were violated, *i. e.*, the original one of the Court of Appeals of July 28 directing Meredith's admission; the District Court's aforesaid order of September 13 which generally embodied the same terms; and the injunction of September 25 directed at the alleged contemners. The claim is, first, that the District Court's order of September 13 superseded the earlier Court of Appeals order of July 28, and that the September 25 order of the Court of Appeals was without significance since it added nothing to the earlier orders except to specifically name the alleged contemners. But it can hardly be said that there was a supersession, since the July 28 order specifically retained jurisdiction. Nor is the September 25 order of no significance, as it is the principal order upon which the alleged contemners' contemptuous conduct is predicated. Moreover, it may be that on trial

---

against abuse of the process of contempt by appellate courts. It has been in the district courts, in the circuit courts, in the courts of first instance, where this abuse has occurred, and this bill limits it in effect to the operation of those courts of the first instance where the abuses have occurred and do now occur."

See also statements by two members of the House Judiciary Committee, Representative Floyd at 48 Cong. Rec. 8780 and Representative Davis at 48 Cong. Rec. App. 314. See also, S. Rep. No. 698, 63d Cong., 2d Sess., p. 18.

the Court of Appeals will limit the charge to its own orders. Secondly, it is said that, since the contempt motion includes an order of the District Court, the requirements of §§ 402 and 3691 make a jury necessary. It would be anomalous for a Court of Appeals to have the power to punish contempt of its own orders without a jury, but to be rendered impotent to do so when the offensive behavior happens to be in contempt of a District Court order as well. We are unable to attribute to Congress an intent to award favored treatment to a person who is contemptuous of two or three orders instead of only one.[8]

## III.

Finally, it is urged that those charged with criminal contempt have a constitutional right to a jury trial.[9] This claim has been made and rejected here again and again. Only six years ago we held a full review of the issue in *Green* v. *United States,* 356 U. S. 165 (1958). We held there that "[t]he statements of this Court in a long and unbroken line of decisions involving contempts ranging from misbehavior in court to disobedience of court orders establish beyond peradventure that criminal contempts are not subject to jury trial as a matter of constitutional right." At 183. Nor can it be said with accuracy that these cases were based upon historical error. It has always been the law of the land, both state and federal, that the courts—except where specifically precluded by statute—have the power to proceed summarily in contempt matters. There were, of course, statutes enacted

---

[8] Our disposition of the certified question makes it unnecessary for us to reach the issue whether the orders allegedly violated were "entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States," §§ 402, 3691.

[9] U. S. Const., Art. III, § 2, cl. 3; Amend. VI. Contemners also claim under Amendments IX and X.

by some of the Colonies which provided trivial punishment in specific, but limited, instances. Some statutes concerned the contempt powers of only certain courts or minor judicial officers. Others concerned specific offenses such as swearing in the presence of officials or the failure of a witness or juror to answer a summons.

But it cannot be said that these statutes set a standard permitting exercise of the summary contempt power only for offenses classified as trivial. Indeed, the short answer to this contention is the Judiciary Act of 1789 which provided that the courts of the United States shall have power to "punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same." [10] It will be remembered that this legislation was enacted by men familiar with the new Constitution. Madison urged passage of the act in the House and five of the eight members of the Senate Committee which recommended adoption, were also delegates to the Constitutional Convention of 1787. 1 Annals of Congress 18, 812–813. It is also asserted that a limitation upon the summary contempt power is to be inferred from the fact that subsequent statutes of some of the States had limitation provisions on punishment for contempts. But our inquiry concerns the standard prevailing at the time of the adoption of the Constitution, not a score or more years later. Finally, early cases have been ferreted out, but not one federal case has been found to support the theory that courts, in the exercise of their summary contempt powers, were limited to trivial offenses.[11] On the contrary, an

---

[10] 1 Stat. 83.

[11] Statutes and cases dealing with limitations on summary power to punish for contempt in the original 13 States have been compiled in an Appendix, which follows this opinion.

1801 opinion in the case of *United States* v. *Duane,* 25 Fed. Cas. 920, No. 14,997, had this significant language:

> "But though the court have power to punish at discretion, it is far from their inclination to crush you, *by an oppressive fine, or lasting imprisonment.* [Emphasis supplied.] They hope and believe offences of this kind will be prevented in future by a general conviction of their destructive tendency, and by an assurance that the court possess both the power and the resolution to punish them." At 922.

Following this holding we have at least 50 cases of this Court that support summary disposition of contempts, without reference to any distinction based on the seriousness of the offense. We list these in the margin.[12] It

[12] *United States* v. *Hudson & Goodwin,* 7 Cranch 32 (1812); *Anderson* v. *Dunn,* 6 Wheat. 204 (1821); *Ex parte Kearney,* 7 Wheat. 38 (1822); *Ex parte Robinson,* 19 Wall. 505 (October Term, 1873); *New Orleans* v. *Steamship Co.,* 20 Wall. 387 (October Term, 1874); *In re Chiles,* 22 Wall. 157 (October Term, 1874); *Ex parte Terry,* 128 U. S. 289 (1888); *In re Savin,* 131 U. S. 267 (1889); *In re Cuddy,* 131 U. S. 280 (1889); *Eilenbecker* v. *District Court,* 134 U. S. 31 (1890); *In re Swan,* 150 U. S. 637 (1893); *Interstate Commerce Comm'n* v. *Brimson,* 154 U. S. 447 (1894); *In re Debs,* 158 U. S. 564 (1895); *Brown* v. *Walker,* 161 U. S. 591 (1896); *In re Lennon,* 166 U. S. 548 (1897); *Wilson* v. *North Carolina,* 169 U. S. 586 (1898); *In re Watts and Sachs,* 190 U. S. 1 (1903); *Bessette* v. *Conkey Co.,* 194 U. S. 324 (1904); *Nelson* v. *United States,* 201 U. S. 92 (1906); *United States* v. *Shipp,* 203 U. S. 563 (1906); *Ex parte Young,* 209 U. S. 123 (1908); *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418 (1911); *Baglin* v. *Cusenier Co.,* 221 U. S. 580 (1911); *Gompers* v. *United States,* 233 U. S. 604 (1914); *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402 (1918); *Ex parte Hudgings,* 249 U. S. 378 (1919); *Blair* v. *United States,* 250 U. S. 273 (1919); *Craig* v. *Hecht,* 263 U. S. 255 (1923); *Michaelson* v. *United States,* 266 U. S. 42 (1924); *Cooke* v. *United States,* 267 U. S. 517 (1925); *McGrain* v. *Daugherty,* 273 U. S. 135, 157 (1927); *Brown* v. *United States,* 276 U. S. 134 (1928); *Sinclair* v. *United States,* 279 U. S. 749 (1929); *Blackmer* v. *United States,* 284 U. S. 421 (1932); *Clark* v. *United States,* 289 U. S. 1 (1933); *Nye* v. *United States,* 313

does appear true that since 1957 the penalties imposed in cases reaching this Court have increased appreciably. But those cases did not settle any constitutional questions as to the punishment imposed.

And with reference to state cases, it is interesting to note that the State of Mississippi has recognized and enforced summary punishment for contempt for over 100 years under the authority of *Watson* v. *Williams,* 36 Miss. 331 (1858), a celebrated case that has been cited with approval in many state jurisdictions as well as in cases of this Court. See *Ex parte Terry,* 128 U. S. 289, 303

U. S. 33 (1941); *Pendergast* v. *United States,* 317 U. S. 412 (1943); *United States* v. *White,* 322 U. S. 694 (1944); *In re Michael,* 326 U. S. 224 (1945); *United States* v. *United Mine Workers,* 330 U. S. 258 (1947); *In re Oliver,* 333 U. S. 257, 274 (1948); *Fisher* v. *Pace,* 336 U. S. 155 (1949); *Rogers* v. *United States,* 340 U. S. 367 (1951); *Hoffman* v. *United States,* 341 U. S. 479 (1951); *Sacher* v. *United States,* 343 U. S. 1 (1952); *Offutt* v. *United States,* 348 U. S. 11 (1954); *Cammer* v. *United States,* 350 U. S. 399 (1956); *Nilva* v. *United States,* 352 U. S. 385 (1957); *Yates* v. *United States,* 355 U. S. 66 (1957); *Green* v. *United States,* 356 U. S. 165 (1958); *Brown* v. *United States,* 359 U. S. 41 (1959); *Levine* v. *United States,* 362 U. S. 610 (1960); *Piemonte* v. *United States,* 367 U. S. 556 (1961); *Ungar* v. *Sarafite, ante,* at 575 (1964).

However, our cases have indicated that, irrespective of the severity of the offense, the severity of the penalty imposed, a matter not raised in this certification, might entitle a defendant to the benefit of a jury trial. See *District of Columbia* v. *Clawans,* 300 U. S. 617 (1937). There Mr. Justice Stone, later Chief Justice, citing many cases, said that "commonly accepted views of the severity of punishment by imprisonment may become so modified that a penalty once thought to be mild may come to be regarded as so harsh as to call for the jury trial, which the Constitution prescribes, in some cases which were triable without a jury when the Constitution was adopted." At 627. In view of the impending contempt hearing, effective administration of justice requires that this *dictum* be added: Some members of the Court are of the view that, without regard to the seriousness of the offense, punishment by summary trial without a jury would be constitutionally limited to that penalty provided for petty offenses.

(1888), and *In re Debs,* 158 U. S. 564, 595 (1895). And just one year before we decided *Green, supra,* Mississippi specifically approved, in *Young* v. *State,* 230 Miss. 525, 528 (1957), its previous holding that the "overwhelming weight of authority is that in such cases [contempt] they [the defendants] were not entitled to a jury trial." *O'Flynn* v. *State,* 89 Miss. 850, 862.[13]

We will make specific reference to only a few of the federal cases. As early as 1812 this Court held that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution. . . . To fine for contempt—imprison for contumacy—inforce the observance of order . . . ." Mr. Justice Johnson in *United States* v. *Hudson & Goodwin,* 7 Cranch 32, 34. In the case of *In re Savin, supra,* at 276, the first Mr. Justice Harlan writing for the Court said: "[W]e do not doubt that the power to proceed summarily, for contempt, in those cases [in presence of court, in official transactions and in resistance to lawful process], remains, as under the act of 1831 . . . . It was, in effect, so adjudged in *Ex parte Terry* [*supra,* at 304]." And in *Eilenbecker* v. *District Court,* 134 U. S. 31 (1890), a contempt was based on the violation of a court order. Mr. Justice Miller said:

> "If it has ever been understood that proceedings according to the common law for contempt of court have been subject to the right of trial by jury, we have been unable to find any instance of it. It has always been one of the attributes—one of the powers necessarily incident to a court of justice—that it

---

[13] The constitution of Mississippi, like that of the United States, also assures the right of trial by jury in criminal cases. "In all criminal prosecutions the accused shall have a right to . . . trial by an impartial jury of the county where the offense was committed . . . ." Miss. Const., Art. III, § 26. "The right of trial by jury shall remain inviolate . . . ." Miss. Const., Art. III, § 31.

should have this power of vindicating its dignity, of enforcing its orders, of protecting itself from insult, without the necessity of calling upon a jury to assist it in the exercise of this power." At 36.

And in 1895 Mr. Justice Brewer in *In re Debs,* 158 U. S. 564, a leading authority in this Court, wrote:

"Nor is there . . . any invasion of the constitutional right of trial by jury. . . .  [T]he power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court.  And this is no technical rule.  In order that a court may compel obedience to its orders it must have the right to inquire whether there has been any disobedience thereof.  To submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half its efficiency." At 594–595.

Mr. Justice Holmes in an equally well known and authoritative decision for this Court, *United States* v. *Shipp,* 203 U. S. 563 (1906), upheld the power of this Court, without a jury, to punish disobedience to its orders.  "The first question," he said, "naturally, is that of the jurisdiction of this court.  The jurisdiction to punish for a contempt is not denied as a general abstract proposition, as, of course, it could not be with success.  *Ex parte Robinson,* 19 Wall. 505, 510; *Ex parte Terry,* 128 U. S. 289, 302, 303." At 572.  He also emphasized that "[t]he court is not a party.  There is nothing that affects the judges in their own persons.  Their concern is only that the law should be obeyed and enforced, and their interest is no other than that they represent in every case." At 574.  Since *Shipp* was a case of original jurisdiction in this Court, testimony was then taken before a commissioner, not a jury, 214 U. S. 386, 471.  After argument this

Court adjudged the defendants guilty, 214 U. S. 386, and sentenced some of them to prison, 215 U. S. 580.

Mr. Justice Holmes also wrote another leading case in the contempt field in 1914, *Gompers* v. *United States,* 233 U. S. 604, in which he made explicit what he left implicit in *Shipp, supra:*

> "The inquiry was directed solely with a view to punishment for past acts, not to secure obedience for the future; and to avoid repetition it will be understood that all that we have to say concerns proceedings of this sort only, and further, only proceedings for such contempt not committed in the presence of the court."   At 606.

.          .          .          .          .

> "It is urged in the first place that contempts cannot be crimes, because, although punishable by imprisonment and therefore, if crimes, infamous, they are not within the protection of the Constitution and the amendments giving a right to trial by jury . . . .   It does not follow that contempts of the class under consideration are not crimes, or rather, . . . offenses, because trial by jury as it has been gradually worked out and fought out has been thought not to extend to them as a matter of constitutional right."   At 610.

In 1919 Chief Justice White in *Ex parte Hudgings,* 249 U. S. 378, restated the same principle in these words:

> "Existing within the limits of and sanctioned by the Constitution, the power to punish for contempt committed in the presence of the court is not controlled by the limitations of the Constitution as to modes of accusation and methods of trial generally safeguarding the rights of the citizen. . . .   [The] only purpose is to secure judicial authority from obstruction in the performance of its duties to the end that means appropriate for the preservation and enforcement of the Constitution may be secured."   At 383.

Finally, Mr. Justice Sutherland in *Michaelson* v. *United States,* 266 U. S. 42 (1924), in upholding the constitutionality of the sections of the Clayton Act contained in 18 U. S. C. §§ 402 and 3691, said that these provisions were of

".  .  . narrow scope, dealing with the single class where the act or thing constituting the contempt is also a crime in the ordinary sense.   It does not interfere with the power to deal summarily with contempts committed in the presence of the court or so near thereto as to obstruct the administration of justice, and is in express terms carefully limited to the cases of contempt specifically defined.  *Neither do we think it purports to reach cases of failure or refusal to comply affirmatively with a decree*—that is to do something which a decree commands .  .  .  . If the reach of the statute had extended to the cases which are excluded a different and more serious question would arise."   At 66.   (Emphasis supplied.)

It is true that adherence to prior decisions in constitutional adjudication is not a blind or inflexible rule.   This Court has shown a readiness to correct its errors even though of long standing.   Still, where so many cases in both federal and state jurisdictions by such a constellation of eminent jurists over a century and a half's span teach us a principle which is without contradiction in our case law, we cannot overrule it.   The statement of the High Court of Errors and Appeals of Mississippi 105 years ago in *Watson* v. *Williams, supra,* is as true and perhaps even more urgent today: [14]

"The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been re-

[14] The fact that *Watson* was a case of civil contempt is not relevant, since its rationale and language are broadly applicable to contempt cases in general.   Further, *Watson* has recently been cited with approval in a Mississippi criminal contempt case, *Young* v. *State, supra,* where the Mississippi Supreme Court reaffirmed that there

garded as a necessary incident and attribute of a court, without which it could no more exist than without a judge. It is a power inherent in all courts of record, and coexisting with them by the wise provisions of the common law. A court without the power effectually to protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against the recusant parties before it, would be a disgrace to the legislation, and a stigma upon the age which invented it. In this country, all courts derive their authority from the people, and hold it in trust for their security and benefit. In this State, all judges are elected by the people, and hold their authority, in a double sense, directly from them; the power they exercise is but the authority of the people themselves, exercised through courts as their agents. It is the authority and laws emanating from the people, which the judges sit to exercise and enforce. Contempts against these courts, in the administration of their laws, are insults offered to the authority of the people themselves, and not to the humble agents of the law, whom they employ in the conduct of their government. The power to compel the lawless offender, against decency and propriety, to respect the laws of his country, and submit to their authority (a duty to which the good citizen yields hearty obedience, without compulsion) must exist, or courts and laws operate at last as a *restraint* upon the upright, who need no restraint, and a license to the offenders, whom they are made to subdue." At 341–342.

The question certified to the Court is therefore answered in the negative.

---

is no right to jury trial in cases of criminal contempt. *Watson* has also been cited by this Court as authority on criminal contempt. *In re Debs*, 158 U. S. 564, 595 (1895).

## APPENDIX TO OPINION OF THE COURT.

This Appendix contains statutes and cases relevant to the punishments for contempt imposed by colonial courts. Although the authority cited here is extensive, it does not purport to be exhaustive.   Research in this period of history is hampered by the fact that complete reports of appellate decisions in most jurisdictions were not available until the nineteenth century.   Reports of the colonial trial courts are even more sparse, and this has particular importance in our study, since contempt citations were usually either not appealable or not appealed.

Numerous observations could be made concerning what is set forth here.[1]   For our present purposes, however, we need only note that we find no basis for a determination that, at the time the Constitution was adopted, contempt was generally regarded as not extending to cases of serious misconduct.   Rather, it appears that the limitations which did exist were quite narrow in scope, being applicable only to a specific contempt[2] or to a particular type of court.

---

[1] For example, punishments of a former age must be judged by the standards of that time and not by the norms of the present.   As Professor Zechariah Chafee observed: "The most significant fact is that the colonists seem to have made very little use of the favorite modern method of punishment by long terms of imprisonment.   They got rid of the worst offenders by executions . . . ; the others they usually subjected to some short and sharp penalty and then turned them loose or else sold them into service.   To imprison thieves and other rascals for years, as we do, would have cost the taxpayers dear, left the prisoners' relatives without support, and kept men idle when the community wanted man-power.   Consequently, most offenders were let out after they had paid their fines and damages to the victim, or had been whipped or otherwise disgraced." 1 Records of the Suffolk County (Mass.) Court, 1671–1680, at lxxix.

[2] The type of statute most frequently found in the Colonies is that which provided for the punishment of witnesses or jurors who failed to appear in court as summoned.   While in most Colonies this offense

## CONNECTICUT.

The Code of 1650, a compilation of the earliest laws and orders of the General Court of Connecticut, provided "that whosoever doth dissorderly speake privately, during the sitting of the courte, with his neighbour" should pay 12 pence fine, "if the courte so thinke meett," and that whosoever revealed secrets of the General Court should forfeit 10 pounds "and bee otherwise dealt withall, at the discretion of the courte . . . ." Code of 1650 (1822 ed.), at 40. The same Code also decreed "[t]hat whosoever shall . . . defame any courte of justice, or the sentences and proceedings of the same, or any of the magistrates or judges of any such courte, in respect of any act or sentence therein passed, and being thereof lawfully convicted in any generall courte, or courte of magistrates, shall bee punnished for the same, by fyne, imprisonment, disfranchisement, or bannishment, as the quality and measure of the offence shall deserve." *Id.,* at 69. This provision was carried forward through the time of the adoption of the Constitution. See Conn. Laws of 1673 (1865 ed.), at 41, and Conn. Acts and Laws (1796 ed.), at 142.

An "Act concerning Delinquents" provided that "if any Person or Persons upon his or their Examination or Trial for Delinquency, or any other Person not under Examination or Trial as aforesaid, in the Presence of any Court, shall either in Words or Actions behave contemptuously or disorderly, it shall be in the power of the Court, Assistant, or Justice to inflict such Punishment upon him

---

was regarded, and punished, as a contempt, it is not clear whether it was so regarded and punished in all jurisdictions.

Some Colonies had statutes making it a contempt for jailers, sheriffs, etc., to refuse to carry out an order of the court. In general, we have not included such statutes.

or them as they shall judge most suitable to the Nature of the Offence. *Provided,* That no single Minister of Justice [justice of the peace, whose criminal jurisdiction was limited to cases in which "the Penalty does not exceed the Sum of *Seven Dollars*"] shall inflict any other Punishment upon such Offenders than Imprisonment, binding to the Peace or good Behaviour to the next County Court, putting them in the Stocks, there to sit not exceeding two Hours, or imposing a Fine, not exceeding *Five Dollars.*" Conn. Acts and Laws (1796 ed.), at 143.

The first Connecticut statute we have been able to find which limited the power of all courts to inflict punishment summarily is cited in an 1824 edition of Connecticut statutes: "If any person, in the presence of any court, shall, either by words or actions, behave contemptuously or disorderly, it shall be in the power of the court to inflict such punishment upon him, by fine or imprisonment, as shall be judged reasonable: Provided, however, that no single minister of justice shall inflict a greater fine than seven dollars, nor a longer term of imprisonment than one month; and no other court shall inflict a greater fine than one hundred dollars, nor a longer term of imprisonment than six months." Conn. Pub. Stat. Laws, 1821 (1824 ed.), at 118–119. This statute applied only to acts of contempt committed in the presence of the court and left "all other cases of contempt to be ascertained and punished according to the course of the common law." *Huntington* v. *McMahon,* 48 Conn. 174, 196 (May Term, 1880). Accord, *Rogers Mfg. Co.* v. *Rogers,* 38 Conn. 121, 123 (February Term, 1871).

The same laws also made it a contempt, punishable summarily by commitment and fine of $200, to refuse to perform or accept service of a writ of habeas corpus. Conn. Pub. Stat. Laws, 1821 (1824 ed.), at 219–220.

Records of cases in the Particular Court between 1639 and 1663 reveal several summary contempt proceedings:

In 1639, Thomas Gridley was "Censured to be whipt att Hartford and bound to his good behavior" for, *inter alia,* using "contempteous words against the orders of Court . . . ." Records of the Particular Court of the Colony of Connecticut, 1639–1663, at 5. Enoch Buck was fined 10 shillings "for irregular speeches in Courte" in 1648. *Id.,* at 60. In 1654, Will Taylor was committed to prison for an unspecified length of time for his "Contemtuous Carriage in the Courte . . . ." *Id.,* at 128. John Sadler was ordered imprisoned for a day and fined 40 shillings in 1655 for "Contemptuous Carrage against the Courte and Magistrates . . . ." *Id.,* at 152. In 1657, both parties in a case were fined 10 shillings for disorderly carriage in court. *Id.,* at 187. In 1663, for, *inter alia,* "defameing the sentenc of the Court and one of the members thereof," Edward Bartlet was ordered to prison for about 10 days and made to give 10 pounds security for his good behavior. *Id.,* at 269. Connecticut Colony Particular Court records also indicate various fines and forfeitures, from two shillings, six pence, to four pounds, imposed on nonappearing parties and jurors between 1647 and 1654. (*E. g.,* Thomas Sherwood fined 40 shillings "for his contempte in not appeareing att Court uppon summons," *id.,* at 47.)

In 1796, Zephaniah Swift, chief justice of the Connecticut Superior Court, wrote of contempt: "But tho all courts but assistants and justices of the peace, have an *unlimitted discretionary power* [emphasis supplied], yet this cannot be deemed to authorize them to inflict capital punishment. It can be supposed to extend only to fine, imprisonment, or such corporal punishment as may be suited to the nature of the offence, and according to the principles of the common law." II Swift, A System of the Laws of Connecticut (1796), at 374.

In 1823, Swift added: "When courts punish for contempts, committed in their presence, they must inflict a

definite fine, or imprison for a certain time in the manner prescribed by the statute: but where they punish for contempts at common law, or not committed in their presence *they may imprison till the further order of the court . . . ."* (Emphasis supplied.) II Swift, A Digest of the Laws of Connecticut (1823), at 359.

### DELAWARE.

We were unable to find any Delaware colonial statutes dealing generally with contempt. Two statutes, apparently passed during the early part of the eighteenth century, provided maximum penalties for certain types of offenses: Jurors who refused to attend could be summarily fined up to 20 shillings; and one who spoke in derogation of a court's judgment or committed any rudeness or misdemeanor in a court while the court was in session could be fined up to five pounds. 1 Del. Laws (1797 ed.), at 117, 120. A 1739 or 1740 "Act against drunkenness, [and] blasphemy" authorized a maximum fine of five pounds for one convicted [3] of using, upon arrest by court order, "abusive, reviling or threatning speeches against . . . [any] court . . . ." *Id.*, at 174. An 1852 Act provided that judges of the Superior Court could punish for contempt as fully "as the justices of the king's bench, common pleas, and exchequer in England, . . . may or can do." Del. Rev. Stat. (1852 ed.), at 317.

In 1818, the Kent Supreme Court said that "[f]or a contempt committed in the presence of a justice of the peace, he may either imprison the offender for a definite period or require sureties for his good behavior." *Patterson* v. *Blackiston,* 1 Del. Cases, 1792–1830 (Boorstin), at 571, 573.

---

[3] It is not clear whether the use of the word "convicted" was intended to preclude summary punishment.

## GEORGIA.

Our research has uncovered no Georgia colonial statutes dealing with contempt. An enactment in 1799 provided for the fine of witnesses and jurors who neglected or refused to appear. Section XX provided for attachment of witnesses and a fine not exceeding $300. Section XLIV provided for a fine of $40 for grand jurors and $20 for petit jurors. Ga. Digest of Laws (1822 ed.), at 205, 210, 215.

An 1801 statute set a fine of $10 as the amount of punishment that could be imposed upon a defaulting witness by a justice of the peace. Ga. Laws, 1801–1810 (1812 ed.), at 17. An 1811 statute made more specific mention of the contempt power of the justices of the peace, providing that these officers could fine or imprison for contempt, but not exceeding $2 or two days. Ga. Laws, 1811–1819 (1821 ed.), at 378.

The earliest reported Georgia contempt case is *State* v. *Noel,* Charlton's Reports (1805–1810) 43 (1806). There the mayor and marshal of the City of Savannah were fined $50 and $10 respectively for failing to comply with an order of the Superior Court directing them to suspend certain City Council proceedings. In 1807 the Superior Court said in *State* v. *White,* Charlton's Reports (1805–1810) 123, 136 (1807), that the inferior courts of record had the power to "inflict punishments at the discretion of the court, for all contempts of their authority." No specific punishment was indicated in that case. In *State* v. *Helvenston,* Charlton's Reports (1811–1837) 48 (1820), several jurors were fined $5 each for having talked with persons not officers of the court.

## MARYLAND.

It appears that in colonial Maryland there was but one statutory enactment directly concerning contempts and

this Act was applicable only to the court of chancery. This was a 1785 Act providing that "in order to enforce obedience to the process, rules and orders, of the chancery court, in all cases where any party or person shall be in contempt for disobedience, non-performance or non-observance, of any process, rule or order, of the chancellor or chancery court, or for any other matter . . . wherein a contempt . . . may be incurred, such party or person shall . . . pay . . . a sum not exceeding ten pounds current money . . . and may stand committed . . . until the said process, rule or order, shall be fully performed . . . and until the said fine . . . shall be fully paid . . . ." II Kilty's Md. Laws, 1800, c. LXXII, § XXII.

Three other colonial Maryland Acts concerned only the punishments of jurors and witnesses who failed to appear as summoned and the enforcement of the rules of court. It is not clear whether these were treated as contempts. A law enacted in 1715 provided that any person duly served with process to appear as a witness who shall default and fail to appear, "shall be fined by the justices of the provincial court one thousand pounds of tobacco . . ." or by the county court, five hundred pounds of tobacco. I Dorsey's Md. Laws, 1692–1839 (1840 ed.), at 20. Another 1715 statute provided that the judges of the provincial and county courts in Maryland could "make such rules and orders from time to time, for the well governing and regulating their said courts . . . as to them in their discretion shall seem meet . . . [and shall enforce these rules with] such fines and forfeitures, as they shall think fit, not exceeding one thousand pounds of tobacco in the provincial court, and five hundred pounds of tobacco in the county court . . . ." I Dorsey's Md. Laws, 1692–1839 (1840 ed.), at 24.

In 1782 the fines to be imposed on witnesses and jurors who failed to appear were altered. The Act provided that "in all cases in which jurors or witnesses shall be sum-

moned to appear at the general court, and shall, without sufficient excuse, neglect to appear, the general court may fine . . . not exceeding thirty-five pounds current money." The same provision applied to the county courts, but there the fine was limited to 20 pounds. I Kilty's Md. Laws, 1799, c. XL.

The only reported Maryland case around the time of the adoption of the Constitution is *State* v. *Stone,* 3 Harris and McHenry 115 (1792). There the chief justice and associate justices of the Charles County Court were each fined 20 shillings and costs by the General Court for refusing to recognize a writ of certiorari which had been directed to them.

The Archives of Maryland report several contempt citations by the Provincial and County Courts from 1658 to 1675. The Provincial Court fined Attorney John Rousby 100 pounds of tobacco for violation of a court order that attorneys must speak in their proper turns. Arch. Md. LXV, 585 (1675). Rousby and two other attorneys were also fined 400 pounds of tobacco each for failing to appear at the Provincial Court and thus causing their clients to suffer nonsuits. Arch. Md. LXV, 383 (1674). And another attorney, who admitted that he had falsified a writ of the Provincial Court, was summarily disbarred from practice. Arch. Md. LXV, 50 (1672).

The county courts imposed punishments for misbehavior in the presence of the court: 500 pounds of tobacco for the use of abusive language in court, Arch. Md. LIV, 566 (1673); 300 pounds of tobacco for wearing a hat in the court's presence, Arch. Md. LIV, 146 (1658); 10 pounds of tobacco for taking the name of God in vain before the court, Arch. Md. LIII, 84 (1660); and 300 pounds of tobacco for using insolent language before the court, Arch. Md. LIV, 9 (1652). Between 1671 and 1674 the Provincial Court cited 23 persons for failure

to appear as jurors or witnesses in response to proper summonses. Each was fined 500 pounds of tobacco. Arch. Md. LXV, 18, 21, 23, 25, 29, 31, 32, 40, 45, 141, 203, 246, 314.

## MASSACHUSETTS.

The Massachusetts Bay Colony and Plymouth Colony enacted many early statutes relating to contempt. In 1641 the General Court [4] decreed that no one in Massachusetts should be imprisoned before sentence if he could put up bail, except "in crimes Capital, and contempt in open Court, and in such cases where some expresse Act of Court doth allow it." Mass. Laws and Liberties (1648 ed.), at 28. Prior to 1648 another General Court order provided "Fine, Imprisonment, *Disfranchisement* or Bannishment" for one "lawfully convict" [5] in any General Court or Court of Assistants of defaming any court of justice, any court order, or any magistrate or judge with respect to a sentence imposed. *Id.*, at 36. In 1665 the General Court made a law permitting corporal punishment for the contempt of refusing to pay the fine imposed for "Prophanation of the Sabbath, Contempt or Neglect of Gods Publick Worship, Reproaching of the Laws, and Authority here Established . . . ." Mass. Colonial Laws, 1660 (1889 ed.), at 232.

Plymouth Colony laws provided that the Court of Magistrates could punish "by fine, imprisonment, binding to the Peace or good Behaviour" for disturbing the peace or defaming any court of justice or judge thereof with

---

[4] From 1634 at least until 1672, the General Court was "the chief Civil Power" of Massachusetts, its principal business being legislation. See 1 Records of the Suffolk County Court, 1671–1680, at xxi-xxii.

[5] It has been argued that the words "lawfully convict" indicate that formal process of indictment was required. See Haskins, Law and Authority in Early Massachusetts, at 278.

respect to any act or sentence. Compact with the Charter and Laws of New Plymouth (1836 ed.), at 249. Fines were provided for grand jurors who refused to serve (40 shillings), grand jurors who failed to appear (10 shillings), and nonappearing witnesses (20 shillings). *Id.*, at 263, 192 (Acts of 1671, 1681).

A 1692 Massachusetts Act provided fines for cursing in the hearing of a justice of the peace—five shillings for the first curse (or two hours in the stocks if unable to pay) and 12 pence for each curse thereafter (or three hours in the stocks). Mass. Bay Charter (1726 ed.), at 9. Various fines were established for nonappearing jurors (20 shillings before 1698, 40 shillings until 1711, four to six pounds until 1784, 40 shillings or five pounds as of 1784),[6] nonappearing witnesses (40 shillings),[7] and defendants who failed to appear before a justice of the peace (10 shillings).[8]

Many early contempt cases are contained in the Records of the Court of Assistants[9] of Massachusetts Bay Colony, 1630–1692, and in several of these, severe sum-

---

[6] See I Province of Mass. Bay: Acts and Resolves (1869 ed.), at 335, *id.*, at 374; Mass. Bay Charter (1726 ed.), at 254; I Mass. Laws, 1780–1800 (1801 ed.), at 185, 189. See also Act providing that nonappearing grand jurors "shall be proceeded against for contempt." Mass. Colonial Laws (1887 ed.), at 88.

[7] I Province of Mass. Bay: Acts and Resolves (1869 ed.), at 374.

[8] *Id.*, at 72. Also *id.*, at 282–283.

[9] The Court of Assistants consisted of the governor, deputy-governor, and the other annually elected assistants or magistrates. It was the institutional ancestor of the Massachusetts Supreme Judicial Court and "also had the functions of an upper house of the legislature and a governor's council. For judicial business it met regularly twice a year . . . to hear and determine appeals from the County Courts, and to exercise original jurisdiction in 'all Causes of divorce, all Capital and Criminal Causes, extending to Life, Member or Banishment.'" I Records of the Suffolk County Court, 1671–1680, at xx–xxi.

mary punishments were inflicted. For example, in 1675 Maurice Brett "for his Contemptuous Carriage Confronting the sentenc of this Court" was sentenced to stand for an hour with his ear nailed to a pillory. At the end of the hour, the ear was to be cut off and he was to pay 20 shillings or be given 10 lashes. I Records of the Court of Assistants, at 57. Also: In 1643, Elizabeth Vane was ordered committed at the pleasure of the court for abusing one of the magistrates (she was released upon humble petition and acknowledgment), II Records of the Court of Assistants, at 132; in 1637 John Greene was fined 20 pounds, committed until the fine was paid, and told not to come into this jurisdiction again "upon paine of fine, or imprisonment at the pleasure of the Courte for speaking contemptuously of the magistrates," *id.*, at 71; in 1633 Captain John Stone was fined 100 pounds and prohibited from returning to the Colony without leave from the government "under the penalty of death" for abusing an officer of the court, assaulting him and calling him "A just asse," *id.*, at 35; in 1630 or 1631 Thomas Foxe was ordered whipped for saying that the court acted in a case "as if they hadd taken some bribe," *id.*, at 12; in 1634 John Lee was ordered whipped and fined "for calling . . . [a court officer] false-hearted knave & hard-hearted knave heavy friend," *id.*, at 43; in 1637 or 1638 Thomas Starr was ordered fined 20 pounds, committed and enjoined to acknowledge his fault the next week for speaking against an order of the court, *id.*, at 73; in 1638 Katherine Finch was ordered whipped and committed until the General Court for speaking against the magistrates and the Churches, *id.*, at 76; and in 1659 William Robbinson was ordered whipped 20 lashes for contemptuous speeches against the whole court and the governor, III Records of the Court of Assistants, at 68.

In addition, Court of Assistants records show: in 1632 Thomas Dexter was ordered set in the bilboes (device

used for punishment at sea, similar to stocks on land), disfranchised and fined 40 pounds for speaking reproachfully against the government and for finding fault with various acts of the Court, II Records of the Court of Assistants, at 30; in 1634 John Lee was ordered whipped and fined 40 pounds for speaking reproachfully of the government (including a statement that the Court of Assistants made laws to pick men's purses), *id.*, at 49; in 1636 Thomas Miller was ordered committed for an unspecified length of time for "certeine seditious & opprobrious speaches, saying wee are all rebells, & traytors" ("wee" probably referring to the court), *id.*, at 63; in 1638 or 1639 Robert Shorthose was ordered set in the bilboes for slighting the magistrate in his speeches, *id.*, at 81; and in 1640 George Hurne was ordered committed (in irons) and whipped for insolent and contemptuous carriage, *id.*, at 93. Various fines for contempts are also reflected in the records. The only instance we can find in which the Court of Assistants did not proceed summarily to punish what was probably considered a contempt is a 1686 case in which Samuell Shrimpton was indicted by grand jury for denying the power of the government, defaming the General Court and the County Court and causing such a tumult in the court to result in "breach of his Majesty's Government." I Records of the Court of Assistants, at 299.

In 1635 the General Court ordered John Endecott committed to prison for an unspecified period "for his contempt in protesting against the proceedeing of the Court . . . ." He was released upon submission and acknowledgment. See Haskins, Law and Authority in Early Massachusetts, at 207. The Records of the Suffolk County Court from 1680 to 1698 reveal two other cases in which men were ordered imprisoned for unspecified periods for "contemptuous carriage in open court." John

Farnum (1681), Records of the Inferiour Court of Pleas (Suffolk County Court), 1680–1698, at 111; John Jones (1685), *id.*, at 128. The Pynchon Court Record, 1639–1702, reveals three instances in which a magistrate fined men for contempts of court. See Colonial Justice in Western Massachusetts, 1639–1702, at 243, 271, 288.

In 1772, the Superior Court of Judicature ordered a party committed for an unspecified period for savagely snatching papers from his opponent's hand. *Thwing* v. *Dennie*, Quincy's Reports, 338. See also the 1767 charge to the grand jury of the chief justice of that court, in which he said that "[t]o strike a Man in the King's Court will subject the Offender to the Loss of his Hand and Imprisonment for Life," and implying that such sentence could be given by the court summarily. *Id.*, at 245.

### NEW HAMPSHIRE.

The only relevant statutes existing in eighteenth century New Hampshire that our research has uncovered were those directed toward witnesses and jurors. An Act passed in 1791 provided that courts could attach any witnesses who failed to appear and, if no reasonable excuse was offered, fine them as much as 10 pounds. A justice of the peace was allowed to fine up to 40 shillings for the same offense. N. H. Laws (1792 ed.), at 96. Another Act of the same year provided that grand jurors who failed to appear could be fined up to three pounds. N. H. Laws (1792 ed.), at 105.

The 1792 New Hampshire Constitution specifically gave the power to punish for contempt to the house of representatives, senate, governor and council. The punishment which they could administer was limited to 10 days' imprisonment. N. H. Laws (1815 ed.), at 10. There was no mention of the contempt power of the New Hampshire courts.

## New Jersey.

Apparently no legislation concerning the punishment of contempts existed in New Jersey until after the adoption of the Constitution. The first statutory provision was enacted in 1798 and concerned only witnesses and jurors in courts for the trial of small causes, which courts had jurisdiction only where the amount in controversy did not exceed $60. The law provided that defaulting jurors or witnesses could be fined not more than $5 nor less than $1. N. J. Rev. Laws (1800 ed.), at 317. In the following year the legislature provided that any circuit court juror who either failed to appear or left a trial should be punished by a *reasonable* fine. N. J. Rev. Laws (1800 ed.), at 395. And also in that year an Act was passed dealing with the power of the Court of Chancery in matters of contempt. It provided that "to enforce obedience to the process, rules, and orders of the court of chancery, where any person shall be in contempt . . . he shall . . . pay . . . a sum not exceeding fifty dollars" and shall be confined until the order of the court is complied with and the fine and costs fully paid. N. J. Rev. Laws (1800 ed.), at 434.

In 1698 the Court of Common Right of East New Jersey fined a contemner 50 pounds and placed him in prison until it should be paid. Contemner had come before the court, demanded to know by what authority it sat, denied that it sat by the authority of the King and resisted when the constable took him into custody. *Case of Lewis Morrice,* I Journal of the Courts of Common Right and Chancery of East New Jersey, 1683–1702, at 311.

## New York.

Perhaps the earliest enactment concerning contempt in colonial New York was the Charter of Liberties and Priv-

ileges, passed by the General Assembly on October 30, 1683. Hamlin and Baker, I Supreme Court of Judicature of the Province of New York, 1691–1704, at 147. The Charter contained a broad provision assuring jury trials in numerous cases and stating that no freeman could be imprisoned, deprived of his freehold or liberty or exiled except by the judgment of 12 peers. However, there was a specific exception from this jury requirement when the fault charged was a contempt.

Our research has uncovered no other statutory provisions dealing with contempt in New York prior to the Constitution. An 1801 law provided that any person swearing in the presence or hearing of a justice of the peace, mayor, recorder or alderman could be placed, in a summary manner, in the stocks for one hour. N. Y. Laws, 1801 (1887 ed.), at 54. Then, in 1829, a fairly comprehensive statute was enacted, designating what actions constituted criminal contempts and limiting punishments to $250 fine and 30 days in jail. 2 N. Y. Rev. Stat., 1828–1835 (1836 ed.), at 207.

There are few reported cases of contempt in colonial New York. One notable instance occurred at the trial of John Peter Zenger in 1735. During the preliminary stages of the trial, Zenger's attorneys filed exceptions to the court, taking the position that the judges' commissions were defective because they had been appointed by Governor Cosby to serve "at pleasure" rather than "during good behavior" as required by law. The judges refused to allow Zenger's attorneys to argue in support of these exceptions, and, instead, cited the lawyers for contempt and disbarred them from further legal practice. The order stated: *"It is therefore ordered* that, for the said contempt, the said James Alexander and William Smith be excluded from any farther practice in this Court, and that their names be struck out of the roll of attorneys of this Court." Buranelli, The Trial of Peter Zenger, 89;

see also Alexander, A Brief Narrative of the Case and Trial of John Peter Zenger, 53–55.

A few colonial cases are mentioned in Goebel and Naughton, Law Enforcement in Colonial New York. Fines of 200 pounds were imposed by the New York Supreme Court in 1763 and 1764 for contempt in refusing to answer questions. At 243. In 1717 the Suffolk Court of Oyer and Terminer ordered a week of imprisonment for one who had affronted the King's Justices. *Id.,* at 606. And in 1729 the Supreme Court imposed a fine of 10 pounds upon one who had "privately given victuals to the jury." *Ibid.*

One post-colonial case is worthy of mention, the case of *John V. N. Yates,* 4 Johnson's Rep. 317 (1809). Yates, an officer of the Court of Chancery, was found in contempt for having forged a name upon a bill filed in that court. He was sent to jail "there to remain until the further order of the court." On writ of habeas corpus the New York Supreme Court held that this was a valid form of commitment and that the Supreme Court had no power to discharge anyone committed for contempt by the Chancery Court. The commitment in this case was not for the purpose of forcing Yates to comply with the will of the Chancery Court, but rather, for punishment. Thus, Yates was imprisoned during the pleasure of the court for a criminal contempt.

### NORTH CAROLINA.

Prior to 1868, North Carolina had few statutes dealing with offenses which might have been considered contempts: A 1741 Act carrying a fine of two shillings and six pence for profanely swearing or cursing in a hearing of a justice of the peace, and a fine of 10 shillings or punishment of up to three hours in the stocks for swearing or cursing in the presence of any court of record, I N. C. Pub. Acts, 1715–1790 (Iredell, 1804 ed.), at 52; a 1777 Act

providing a fine of 50 pounds for nonappearance of witnesses, I N. C. Laws (Potter, 1821 ed.), at 298; a 1779 Act fining jurors who failed to appear at superior courts 200 pounds and fining nonappearing "bystanders" 50 pounds, I N. C. Pub. Acts, 1715–1790 (Iredell, 1804 ed.), at 279; and a 1783 Act changing the fine against jurors to 10 pounds and establishing fines of five pounds for failing to appear as county court jurors and 20 shillings for nonappearing "talismen," *id.*, at 332.

The first general statute in North Carolina limiting the power to punish summarily for contempt was enacted in 1868 or 1869. It provided a maximum penalty of $250 and 30 days' imprisonment. Statutes of 1868–1869, c. 177, § 2, cited in Battle's Revisal of the N. C. Pub. Stat. (1873 ed.), at 257.

<center>PENNSYLVANIA.</center>

Prior to the adoption of the Constitution there were three Pennsylvania statutes relevant to the punishment of contempts. The Act of 1713, which established the orphans' courts of Pennsylvania, provided that "if any person . . . summoned to appear . . . shall make default, the Justices may send their attachments for contempts, and may force obedience to their warrants, sentences and orders, concerning any matter or thing cognizable in the same courts by imprisonment of body, or sequestration of lands or goods, as fully as any court of equity may or can do." I Pa. Laws, 1700–1781 (1810 ed.), at .84.

A 1715 Act, creating the "Supreme or Provincial Court of Law and Equity," provided in § I that this court would "exercise the jurisdictions and powers hereby granted concerning all and singular the premises, according to law, as fully and amply to all intents and purposes whatsoever, as the justices of the courts of King's Bench, common pleas and exchequer at Westminster, or any of them, may

or can do" [10] and to "correct and punish the contempts, omissions and neglects, favors, corruptions and defaults of all or any of the justices of the pleas, sheriffs, coroners, clerks and other officers within the said respective counties." III Pa. Stat. at Large, 1712–1724 (1896 ed.), at 66–67. Section III of the same Act provided that when sitting as a court of equity, this court could enforce obedience to its orders and decrees by "like process, orders and proceedings thereupon, as are and hath been used in like cases in or by the said courts of chancery or exchequer in Great Britain . . . ." III Pa. Stat. at Large, 1712–1724 (1896 ed.), at 68.

In 1722, Pennsylvania passed "An Act for Establishing Courts of Judicature in this Province." Section VI said that these courts "shall minister justice to all persons, and exercise the jurisdictions and powers hereby granted concerning all and singular the premises according to law, as fully and amply, to all intents and purposes whatsoever, as the justices of the court of King's Bench, common pleas and exchequer at Westminster, or any of them, may or can do." III Pa. Stat. at Large, 1712–1724 (1896 ed.), at 303.

No Pennsylvania enactment was specifically directed to the matter of criminal contempt until 1809. By the terms of this Act, the summary contempt power of the several courts of the commonwealth was limited to official misconduct of court officers, disobedience of court process by officers, parties, jurors or witnesses and misbehavior of any person in the presence of the court. The punishment of imprisonment for contempts was applicable "only to such contempts as are committed in open court; and all other contempts shall be punished by fine only." Pa. Laws, 1808–1812, at 55–56.

---

[10] It has not been contended that the courts of England were limited to trivial punishments for contempt.

In *Feree* v. *Strome,* 1 Yeates 303 (1793), a witness failed to appear as summoned to the Nisi Prius Court of Lancaster County. "He was reprimanded for his conduct, but as he asserted, that he did not conceive himself to be subpoenaed, he was dismissed without any fine." In *Respublica* v. *Oswald,* 1 Dall. 343 (1788), the Pennsylvania Supreme Court levied a fine of 10 pounds and an imprisonment of one month upon one who published a contemptuous article. In passing sentence the court said: "some difficulty has arisen with respect to our sentence; for, on the one hand, we have been informed of your circumstances, and on the other we have seen your conduct: your circumstances are small, but your offense is great and persisted in. Since, however, the question seems to resolve itself into this, whether you shall bend to the law, or the law shall bend to you, it is our duty to determine that the former shall be the case." At 353.

The Supreme Court issued attachment for a contempt against another publisher in *Bayard* v. *Passmore,* 3 Yeates 438, 441 (1802). Contemner was required to secure his appearance by posting $300 and was admonished to "consider well, what atonement he will make to the court . . . for the gross injury." It is later reported that contemner was fined $50 and imprisoned for 30 days, to remain in prison until the fine and costs were paid. 3 Yeates 442.

The Records of the Courts of Quarter Sessions and Common Pleas of Bucks County, Pennsylvania, 1684–1700, report several contempt attachments. Thomas Coverdale was fined five shillings for coming into court drunk. (At 111.) Nine jurors were fined five shillings apiece for their failure to appear as summoned. (At 391.) Two others were fined three shillings apiece for the same offense. (At 211.) And there are three reports of one Richard Thatcher being committed for abusing the justices on the bench. (At 100, 198, 208.) In each instance he was held in custody until the next day when he was

fined 50 shillings and committed until he could produce sureties for his good behavior and his appearance at the next term of court. (At 101, 199, 208.)

## RHODE ISLAND.

The only laws existing in colonial Rhode Island which in any way concerned contempt of court were confined to the punishment of witnesses and jurors for failure to appear in court. An Act which was in force in 1798 but which probably dated back to 1729, provided that if a witness failed to appear, the court could bring him before it by writ of attachment and impose a fine not exceeding $20 and place the witness in prison until the fine was paid. R. I. Laws (1798 ed.), at 206. Another Act, of like dates, provided that jurors who failed to appear should forfeit and pay a sum not exceeding $5. R. I. Laws (1798 ed.), at 185.

Research has disclosed very few contempt cases from colonial Rhode Island. However, several cases are reported from the Court of Trials of the Colony of Providence Plantations between 1647 and 1670. In two instances where persons used contemptuous words before this court they were required to post bond of 10 pounds sterling to secure their future good behavior. I R. I. Court Records, 1647–1662, at 29, 51. A fine of five shillings was imposed upon another who used contemptuous words to the court while drunk. II R. I. Court Records, 1662–1670, at 58. And between 1647 and 1662 a total of 20 persons were fined 10 shillings each for failure to appear as jurors when summoned. I R. I. Court Records, 1647–1662, at 16, 19, 29, 30, 35, 73, 77.

## SOUTH CAROLINA.

It appears that colonial South Carolina imposed broader restraints upon its courts in the punishment of contempts than any other Colony. A 1702 Act provided

that a witness who failed to appear at the Court of General Sessions should pay 10 pounds plus damages, or up to 100 pounds if he appeared but refused to give evidence. The witness could be imprisoned until the fine was paid. II S. C. Pub. Stat. Law (Brevard, 1814 ed.), at 338. A 1731 statute re-enacted these provisions and provided that nonappearing jurors could be summarily fined 40 shillings. S. C. Pub. Laws (Grimke, 1790 ed.), at 129, 126. Under the same Act, judges were permitted to fine up to 10 pounds for "any misbehaviour or contempt" in court and to imprison until payment was made; and if any person used violence in the courts, the judge could fine at his discretion and imprison until payment was made. *Id.*, at 129. An 1811 Act provided that when an affray occurred "to the disturbance of the court," when the court was sitting, the judge could order the offenders brought before him and "make such order or orders . . . as is or may be consistent with law, justice and good order." Acts and Resolutions of the S. C. General Assembly, December, 1811, at 33.

In *Lining* v. *Bentham*, 2 Bay's Reports 1 (1796), a justice of the peace had ordered a man imprisoned for accusing the justice with gross partiality and abuse of power. The South Carolina Constitutional Court of Appeals affirmed the "power of a magistrate to commit for insults or contempts" offered in the presence of the court. The court, however, added the *dictum* that contempts committed out of the presence of the court "ought to" be prosecuted by indictment.

In *State* v. *Johnson*, 1 Brevard's Reports 155 (1802), a justice of the peace had ordered a woman imprisoned for an unspecified length of time for coming to his office, treating him contemptuously and threatening him. The Charleston Constitutional Court held that the 1731 Act providing punishment by fine for contempt in court did

not apply to justices of the peace, who have "indispensably requisite" power to commit for contempt.

In *State* v. *Applegate,* 2 McCord's Reports 110 (1822), a justice of the peace had ordered a constable imprisoned for failing to carry out his duties. The Charleston Constitutional Court ruled that the constable had to be discharged, as all courts have the power "[t]o commit for a contempt done in the face of a court," but the power to imprison for a contempt done out of court is reserved to "courts of the highest jurisdiction."

## VIRGINIA.

The only colonial Virginia contempt statutes which we were able to find were Acts specifying fines, usually in terms of pounds of tobacco, for nonappearance of jurors and witnesses.[11]   A 1788 Act established a maximum fine of 10 pounds sterling for jurors "guilty of a contempt to the court . . . ."   12 Hening's Va. Stat. at Large, at 746. In 1792, the limit was changed to $30.   Va. Acts (1803 ed.), at 101.   Another 1792 Act set forth procedures to be followed in issuing and pursuing process of contempt. Va. Acts (1803 ed.), at 66, 90–91.

The first general contempt statute was passed in 1831. It specified four different categories of contempts in which judges had power to inflict punishments summarily. The power to punish the first class of contempts—mis-

---

[11] 1660: witnesses fined 1,000 pounds of tobacco for quarter courts, 350 pounds of tobacco for county courts, 2 Hening's Va. Stat. at Large, at 23–24, 69; 1734: petit jurors before justices of Oyer and Terminer fined up to 400 pounds of tobacco, 4 Hening's Va. Stat. at Large, at 404; 1777: witnesses not attending the General Court fined five pounds (sterling) or 1,000 pounds of tobacco, plus costs, Va. Pub. Acts (1785 ed.), at 73; 1788: same fine for District Court witnesses, 12 Hening's Va. Stat. at Large, at 748; 1792: grand jurors fined up to $8, Va. Acts (1803 ed.), at 100.

behavior in the presence of courts—was limited to $50 or 10 days' imprisonment. The other categories—violence or threats of violence to judges, witnesses or jurors, misbehavior of court officers in official transactions, and disobedience to a court order—were not specifically limited.[12] Supp. to the Va. Rev. Code (1833 ed.), at 143–144.

In Criminal Law in Colonial Virginia, Arthur P. Scott discusses early Virginia contempt cases. He states that "[c]ontempt of court was sharply reproved. The least that was required was an open apology, and the court often added a fine, or commitment to prison, usually to last until bond for good behavior was furnished. Sometimes an hour or two in the stocks was prescribed." At 171–172.[13] Scott concludes: "On the whole, a review of the attitude of the Virginia magistrates would indicate that they acted reasonably and moderately. The power

---

[12] See *Yoder* v. *Commonwealth*, 107 Va. 823, 833: "The first class is, 'Misbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice.' But the limitation of [this] section . . . does not apply to the second, third, fourth and fifth classes into which [the general] section . . . is divided."

[13] The following are cases cited by Scott at 172–173: In 1662, William Hatton was bound over to the General Court for saying (outside court) that the justices were not fit to sit; in 1684, Robert Smith had to petition humbly for saying that the court had done more than it could answer or justify; in 1685, Humphrey Chamberlain was put in jail for standing with a drawn sword in the road between the courthouse and the ferry and fined five pounds sterling plus the cost of repairing the prison for breaking his way out; in 1703, Mary Russell was ordered to jail until she could give bond for good behavior for saying that she had gotten as little justice in court as she would have in hell with the devil sitting as judge; in 1720, Colonel Bolling was similarly punished for calling on God to damn the justices; and in 1748, Richard Dunning was ordered committed for saying that the judges never did any good.

to punish for contempt is always open to abuse. The persons injured are judges in their own case. The only safeguard, outside of public opinion, lies in the character of the persons intrusted with this power." At 174.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.

For many reasons I cannot agree with the Court's opinion. In the first place, Congress has never expressly given the Federal Courts of Appeals jurisdiction to try and punish people for criminal contempt of court, and I am unwilling to hold that such a power exists in these courts in the absence of a clear and unequivocal congressional grant. The business of trial courts is to try cases. That of appellate courts is to review the records of cases coming from trial courts below. In my judgment it is bad for appellate courts to be compelled to interrupt and delay their pressing appellate duties in order to hear and adjudicate cases which trial courts have been specially created to handle as a part of their daily work.[1] And in particular, I believe that it is highly disruptive and downright injurious to appellate courts for them to attempt to take over and try criminal contempt cases, surcharged as these cases almost always are with highly emotional quarrels. Compare, e. g., cases cited in Green v. United States, 356 U. S. 165, 199, n. 8 (dissenting opinion). Appellate courts are too useful a part of our judicial system to be subjected to such unnecessary ordeals. I say unnecessary because trial courts are as qualified and capable to try criminal contempt cases as they are to try others.

Assuming, however, that a United States Court of Appeals does have jurisdiction to try criminal contempt

---

[1] What I have said above, of course, has no application whatever to the useful practice, authorized by statute, by which circuit judges sometimes sit on District Courts and district judges sometimes sit on Courts of Appeals. See 28 U. S. C. §§ 2284, 291, 292.

cases, I agree for the reasons set out in Part A of my Brother GOLDBERG's dissenting opinion that Congress has commanded that defendants in those cases be accorded a right to trial by jury. His powerful arguments on this point stand unanswered by the Court. Even in construing statutes and rules governing civil cases we have taken pains, as Congress commanded, to resolve all doubts in favor of trial by jury as guaranteed by the Seventh Amendment.[2] We should certainly be equally alert to construe statutes governing trials for criminal contempt so as to protect the right of jury trial guaranteed for the "Trial of all crimes" by section 2, cl. 3 of Article III of the original Constitution and for "all criminal prosecutions" by the Sixth Amendment.

I think that in denying a jury trial here the Court flies in the face of these two constitutional commands. My reasons for this belief were stated in *Green* v. *United States,* 356 U. S. 165, 193 (dissenting opinion), and in other opinions cited in the margin which I have written or to which I have agreed.[3] No provisions of the Consti-

---

[2] See *Dairy Queen, Inc.,* v. *Wood,* 369 U. S. 469; *Beacon Theatres, Inc.,* v. *Westover,* 359 U. S. 500. See also *Simler* v. *Conner,* 372 U. S. 221. The Seventh Amendment provides:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

[3] See also, *e. g., In re McConnell,* 370 U. S. 230; *In re Murchison,* 349 U. S. 133; *Offutt* v. *United States,* 348 U. S. 11; *In re Oliver,* 333 U. S. 257; *Ungar* v. *Sarafite, ante,* at 592 (DOUGLAS, J., dissenting); *Piemonte* v. *United States,* 367 U. S. 556, 565 (DOUGLAS, J., dissenting); *Levine* v. *United States,* 362 U. S. 610, 620 (dissenting opinion); *Brown* v. *United States,* 359 U. S. 41, 53 (WARREN, C. J., dissenting); *Yates* v. *United States,* 355 U. S. 66, 76 (DOUGLAS, J., dissenting); *Nilva* v. *United States,* 352 U. S. 385, 396 (dissenting opinion); *United States* v. *United Mine Workers,* 330 U. S. 258, 328 (opinion of BLACK and DOUGLAS, JJ.).

tution and the Bill of Rights were more widely approved throughout the new nation than those guaranteeing a right to trial by jury in all criminal prosecutions.  Subsequent experience has confirmed the wisdom of their approval.  They were adopted in part, I think, because many people knew about and disapproved of the type of colonial happenings which the Court sets out in its appendix—cases in which, as reported by the Court, people had been sentenced to be fined, thrown in jail, humiliated in stocks, whipped, and even nailed by the ear to a pillory, all punishments imposed by judges without jury trials.  Unfortunately, as the Court's opinion points out, judges in the past despite these constitutional safeguards have claimed for themselves "inherent" power, acting without a jury and without other Bill of Rights safeguards, to punish for criminal contempt of court people whose conduct they find offensive.  This means that one person has concentrated in himself the power to charge a man with a crime, prosecute him for it, conduct his trial, and then find him guilty.  I do not agree that any such "inherent" power exists.[4]  Certainly no language in the Constitution permits it; in fact, it is expressly forbidden by the two constitutional commands for trial by jury.  And of course the idea that persons charged with criminal offenses such as criminal contempt are not charged with "crimes" is a judicial fiction.  As I said in *Green,* I think that this doctrine that a judge has "inherent" power to make himself prosecutor, judge and jury seriously encroaches upon the constitutional right to trial by jury and should be repudiated.

In *Green* the Court affirmed a three-year sentence imposed for criminal contempt.  But now in note 12 of its opinion in the present case the Court has inserted an

---

[4] See *Green* v. *United States,* 356 U. S. 165, 193 (dissenting opinion), and opinions cited, *supra,* n. 3.

ambiguous statement which intimates that if a sentence of sufficient "severity" had already been imposed on these defendants, a majority of the Court would now overrule *Green* in part, by holding that if a criminal contempt charge is tried without allowing the defendant a jury trial, punishment is constitutionally limited to that customarily meted out for "petty offenses." [5] I welcome this as a halting but hopeful step in the direction of ultimate judicial obedience to the doubly proclaimed constitutional command that all people charged with a crime, including those charged with criminal contempt, must be given a trial with all the safeguards of the Bill of Rights, including indictment by grand jury and trial by jury.

Whatever is included within the scope of "petty offenses," certainly if the present defendants committed the acts with which they are charged, their crimes cannot be classified as "petty," but are grave indeed. These defendants nevertheless, like others charged with crimes, should have their cases heard according to constitutional due process, including indictment and trial by jury. Nothing less can measure up to the kind of trials which Article III and our Bill of Rights guarantee. It is high time, in my judgment, to wipe out root and branch the judge-invented and judge-maintained notion that judges can try criminal contempt cases without a jury.[6] It will

---

[5] "Some members of the Court are of the view that, without regard to the seriousness of the offense, punishment by summary trial without a jury would be constitutionally limited to that penalty provided for petty offenses." *Ante,* p. 695.

[6] Of course, "it should be emphasized that we are not at all concerned with the power of courts to impose conditional imprisonment for the purpose of compelling a person to obey a valid order. Such coercion, where the defendant carries the keys to freedom in his willingness to comply with the court's directive, is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial de-

be a fine day for the constitutional liberty of individuals in this country when that at last is done.

MR. JUSTICE GOLDBERG, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS join, dissenting.

In response to the certified question, I would answer that defendants have both a statutory and a constitutional right to have their case tried by a jury.

A. THE STATUTORY RIGHT TO A JURY TRIAL.

Defendants claim that 62 Stat. 844, 18 U. S. C. § 3691, entitles them to a jury trial in this case. That statute provides in relevant part that "the accused, upon demand therefor, shall be entitled to trial by a jury" whenever the alleged contempt "shall consist in willful disobedience of

---

crees. . . . In my judgment the distinction between conditional confinement to compel future performance and unconditional imprisonment designed to punish past transgressions is crucial, analytically as well as historically, in determining the permissible mode of trial under the Constitution." *Green* v. *United States*, 356 U. S. 165, 197–198 (dissenting opinion). It was this kind of *conditional* imprisonment for the purpose of compelling obedience to a valid court order that was involved in *Watson* v. *Williams*, 36 Miss. 331, which the Court stresses so heavily at the concluding part of its opinion. In that Mississippi case Watson refused to deliver property to minor children whose guardian he had been. The lower court had entered an order "committing the plaintiff to the jail of Lowndes county for safe keeping, *until he comply with the order of the court.*" *Id.*, at 340. (Emphasis added.) The Supreme Court of Mississippi dismissed the appeal for want of jurisdiction. As I said in *Sacher* v. *United States*, 343 U. S. 1, 22 (dissenting opinion), with respect to this kind of conditional civil contempt order, I agree with this statement of Mr. Justice Holmes: "I would go as far as any man in favor of the sharpest and most summary enforcement of order in Court and obedience to decrees, but when there is no need for immediate action contempts are like any other breach of law and should be dealt with as the law deals with other illegal acts." *Toledo Newspaper Co.* v. *United States*, 247 U. S. 402, 425–426 (dissenting opinion).

any lawful writ, process, order, rule, decree, or command of any district court of the United States by doing or omitting any act or thing in violation thereof, and the act or thing done or omitted also constitutes a criminal offense under any Act of Congress . . . ," except if the alleged contempt is "committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States." The statutory right to a jury trial thus turns on three essential factors: (1) the source of the order; (2) the nature of the alleged violation; and (3) the character of the party that "brought or prosecuted" the "suit or action." I conclude for the reasons stated below that the District Court was the source of the basic order in this case; that the nature of the alleged violation would make it a criminal offense under 74 Stat. 86, 18 U. S. C. (Supp. IV) § 1509; and that the "suit or action" in the case was brought and prosecuted not by the United States, but by James Meredith, a private party. It follows that defendants have a statutory right to be tried for their alleged contempt by a jury of their peers.

### 1. *The Source of the Order.*

The show-cause order entered by the Court of Appeals on January 4, 1963, specified three earlier orders which defendants allegedly violated.[1] The acts committed were alleged to be "for the purpose of preventing compliance with this Court's [the Court of Appeals'] order of July 28, 1962, and of the similar order of the United States District Court for the Southern District of Mississippi, entered on September 13, 1962, and were in wilful disobedience and defiance of the temporary restraining order

---

[1] The show-cause order is printed *infra,* at 760, as Appendix A to this opinion. The relevant orders in this case are also reported in 7 Race Rel. L. Rep. 739 *et seq.*

of this Court [the Court of Appeals] entered on September 25, 1962." A brief analysis of the background and content of each of these three orders is necessary to an undertanding of the problem.

After James Meredith was denied admission to the University of Mississippi, he filed suit in the United States District Court for the Southern District of Mississippi, which denied the requested relief. On appeal, the United States Court of Appeals reversed the judgment and directed the District Court to order Meredith's admission. The mandate of the Court of Appeals was then stayed by a single judge of that court. The Court of Appeals immediately recalled its mandate, issued a new one explicitly directing the District Court forthwith to issue a permanent injunction compelling Meredith's admission to the University, and vacated the stay granted by the single judge. On July 28, 1962, the Court of Appeals, in aid of its appellate jurisdiction, issued its own preliminary injunction,[2] "[p]ending such time as the District Court has issued and enforced the orders herein required and until such time as there has been full and actual compliance in good faith with each and all of said orders . . . ." The Court of Appeals' preliminary injunction, which ran against "the . . . [defendants,] all persons acting in concert with them, as well as any and all persons having knowledge of the decree . . . ," was substantially the same as the permanent injunction which the Court of Appeals directed the District Court to enter. A single judge again stayed the mandates of the Court of Appeals, but on September 10, 1962, MR. JUSTICE BLACK, after consultation with the members of this Court,

---

[2] The "preliminary injunction" was actually "issued" on July 27, 1962, as part of an opinion signed by Judge Wisdom. The order, which is printed *infra*, at 763, as Appendix B to this opinion, is dated July 28, 1962.

vacated all the stays issued by the single judge of the Court of Appeals.[3]

Three days later, on September 13, 1962, the District Court, declaring that the "matter is now before [it] by virtue of the Mandate of the United States Court of Appeals for the Fifth Circuit and the Mandate of Mr. Justice Black . . . ," issued a permanent injunction as directed by the Court of Appeals.[4] This injunction was substantially identical with the preliminary injunction issued by the Court of Appeals on July 28, 1962.

At this juncture, therefore, two substantially identical injunctions appear to have been in effect: the "preliminary" one issued by the Court of Appeals on July 28, 1962; and the "permanent" one issued by the District Court on September 13, pursuant to the mandate of the Court of Appeals. The show-cause order subsequently entered against defendants by the Court of Appeals alleges separate violations of both injunctions. It seems clear, however, that any act allegedly committed by contemners in violation of the preliminary injunction would necessarily have violated the permanent injunction as well. This Court has held that a single act or course of conduct alleged to be in violation of two identical orders cannot be punished as two separate contempts. See *Yates* v. *United States,* 355 U. S. 66. Also see *United States* v. *Costello,* 198 F. 2d 200. This is no less true if the two orders were issued by different federal courts, especially if the earlier order was designated "preliminary" and the later one "permanent." I would conclude therefore that, at least for purposes of a contempt conviction, the preliminary injunction entered by the Court of Appeals on July 28, 1962, to protect its appellate jurisdiction, was superseded by the substantially identical permanent

---

[3] 83 S. Ct. 10.

[4] The District Court's permanent injunction is printed *infra,* at 766, as Appendix C to this opinion.

injunction entered by the District Court on September 13, pursuant to the mandates of the Court of Appeals and MR. JUSTICE BLACK.

It is argued, however, that the preliminary injunction entered by the Court of Appeals on July 28, 1962, explicitly applied until James Meredith's "actual admission" to the University. This part of the Court of Appeals' order must be construed in the context of the other orders entered on July 28, 1962, and the immediately preceding days. During this time the Court of Appeals was attempting finally and definitively to secure James Meredith's admission to the University. To accomplish this, it concluded, correctly I think, that there should be no lapse in the operation of the substantive terms of the injunction until the desired end had been achieved. Therefore, the Court of Appeals announced the terms of the injunction which would be in effect from that time until Meredith's admission was secured. It also issued a mandate requiring the District Court to incorporate these terms into a permanent injunction. The operative effect of these orders was that, in the event that the District Court's permanent injunction failed fully to incorporate the substantive terms of the Court of Appeals' preliminary injunction, then the unincorporated provision would remain in effect as an order of the Court of Appeals. But in the event that the District Court's permanent injunction fully incorporated the substantive terms of the Court of Appeals' preliminary injunction, then the injunction would become an order of the District Court. In this way, the Court of Appeals was assured that each of the substantive terms of its injunction would remain in effect from the time of the order until Meredith's admission and that none of the terms of the injunction would simultaneously be incorporated in orders of two courts. The District Court's permanent

injunction did in fact incorporate all the substantive terms of the Court of Appeals' preliminary injunction. Thus, so long as it remained in effect, as it did until Meredith's admission, it necessarily superseded the Court of Appeals' preliminary injunction. It follows from this, that defendants' acts which allegedly violated both the Court of Appeals' order of July 28, 1962, and the District Court's order of September 13, 1962, must be deemed only alleged violations of the District Court's permanent injunction of September 13, 1962. Any allegation of contempt of the Court of Appeals' preliminary injunction of July 28, 1962, must be deemed without legal significance for purposes of this proceeding.

The third and last order which defendants were accused of violating was "the temporary restraining order of this Court [the Court of Appeals] entered on September 25, 1962." [5] That order specifically named defendant Barnett and others and temporarily restrained them "and all persons in active concert or participation with them" from "interfering with or obstructing" compliance with the Court of Appeals' order of July 28, 1962, and with the District Court's order of September 13, 1962. It also restrained them from committing other designated acts which were not specifically covered by the earlier orders (*e. g.*, instituting civil or criminal actions against Meredith). Defendants, however, were not accused in the show-cause order of violating the *entire* temporary restraining order of September 25, 1962, but only that part of the order restraining them "from interfering with or obstructing the enjoyment of rights or the performance of duties under the order of this Court [the Court of Appeals] of July 28, 1962, in the case of *Meredith* v. *Fair,* and a similar order of the District Court for the Southern

---

[5] The Court of Appeals' temporary restraining order is printed *infra,* at 769, as Appendix D to this opinion.

District of Mississippi in that case . . . ." Each speci-
fied violation in the show-cause order related to the per-
manent injunction of September 13, 1962, and the pre-
liminary injunction of July 28, 1962. Defendants, in
their notice of "the essential facts constituting the crim-
inal contempt charged," Rule 42 (b), Fed. Rules Crim.
Proc., received no notice that they were being charged
with violating any provisions of the Court of Appeals'
temporary restraining order of September 25, 1962, other
than those derived directly from the earlier orders.

With respect to the alleged contempt here charged,
therefore, the Court of Appeals' temporary restraining
order added nothing to the earlier orders, except to name
specifically one of the defendants. But this was ob-
viously unnecessary, as the Government must concede.
Governor Barnett must be deemed included within the
coverage of the earlier orders enjoining "all persons act-
ing in concert with [the named defendants], as well as
any and all persons having knowledge of the decree . . . ."
Were this not so, Governor Barnett's alleged contempts
of the earlier orders would have to fall, as would Lieu-
tenant Governor Johnson's alleged contempt of all the
orders he is accused of violating, since he was not specifi-
cally named in any of them.

Thus, unless form is to prevail over substance, we
must conclude that there has been no independently
alleged violation of the Court of Appeals' temporary
restraining order of September 25, 1962. That order
therefore has no bearing on whether defendants have a
statutory right to a jury trial.

In sum, therefore, I conclude that the District Court's
permanent injunction of September 13, 1962, super-
seded and replaced the Court of Appeals' substantially
identical preliminary injunction of July 28, 1962, and
that the Court of Appeals' temporary restraining order

of September 25, 1962, as it is relevant here, added nothing to the earlier orders. Thus, although the show-cause order alleged contempts of two orders of the Court of Appeals and one order of the District Court, I would hold that for purposes of deciding whether 18 U. S. C. § 3691 is applicable, defendants have been charged with violating only one order, which was issued by a "district court of the United States."

Even if I were to agree with the Court, however, that defendants were effectively charged with contempt of all three orders, my conclusion would remain the same. The statute does not say in negative terms that whenever the alleged contempt "shall consist in willful disobedience of any lawful . . . order" of any Court of Appeals, the accused shall *not* be entitled to a trial by a jury. It says in affirmative terms that whenever the alleged contempt "shall consist in willful disobedience of any lawful . . . order . . . of any district court . . . , the accused . . . *shall* be entitled to trial by a jury." (Emphasis added.) Defendants here are charged with disobedience of an order of a District Court. The fact that they are charged *also* with disobedience of orders of a Court of Appeals should not defeat their statutory right to a jury trial.

### 2. *The Nature of the Alleged Violation.*

The second relevant question in deciding whether defendants have a statutory right to a jury trial is whether "the act or thing done or omitted also constitutes a criminal offense under any Act of Congress . . . ." 18 U. S. C. § 3691. This is not in dispute here. The question certified by the Court of Appeals specified that "the acts charged as constituting the alleged disobedience were of a character as to constitute also a criminal offense under an Act of Congress . . . ." While the Court is not bound by the facts assumed in a certified question, it is clear here

that contemners' alleged acts would constitute violations of 18 U. S. C. (Supp. IV) § 1509.[6] The Government does not dispute this.

### 3. *The Character of the Party Which Brought the Suit or Action.*

The third and final question in deciding whether defendants have a statutory right to a jury trial is whether the alleged contempt was "committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States." 18 U. S. C. § 3691.

The Government contends that it entered the case on September 18, 1962, and that the Court of Appeals' temporary restraining order of September 25, 1962, which was issued on its motion, was thus an order entered in a suit or "action brought or prosecuted in the name of, or on behalf of, the United States." My previous conclusion—that the Court of Appeals' order of September 25, 1962, was of no legal significance so far as the charged contempts are concerned—provides a complete answer to the Government's contention. If I am correct in concluding that the only operative order was the permanent injunction entered by the District Court on September 13, 1962, at a time when no one claims the United States had any formal interest in the case, then it necessarily follows that defendants are charged with contempt of an order entered in a suit brought in the name of, and on behalf of, a private party, and not the United States.

---

[6] The statute provides in relevant part that:

"Whoever, by threats or force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

Even assuming, *arguendo,* that the Court of Appeals' order of September 25, 1962, had some independent legal significance, I could not conclude, as the Court does, that it was "entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States." The Court of Appeals' order authorizing the United States to participate in the case, authorized it to participate "as *amicus curiae,*" not as a party. It also authorized the United States "to submit pleadings, evidence, arguments and briefs and to initiate such further proceedings, including proceedings for injunctive relief and proceedings for contempt of court . . . ." The Court of Appeals entered the temporary restraining order of September 25, 1962, on motion made by the United States pursuant to this authorization. But the applicable statute does not exempt from the protection of a jury trial "contempts committed in disobedience of any lawful . . . order . . . entered" *upon motion by the United States.* It only exempts contempts committed in disobedience of "any lawful . . . order . . . entered *in any suit or action brought or prosecuted in the name of, or on behalf of, the United States.*" (Emphasis added.) The touchstone of the exemption is thus the party who brought or prosecuted the basic *suit or action,* not the party upon whose motion the violated order was entered. This reading of the statute is buttressed by the repeated references in the congressional debates to suits where the United States is a "party." See, *e. g.,* 48 Cong. Rec. 8780, 8785; 51 Cong. Rec. 9672, 14413, 15946.

The Government contends, however, that it was, in effect, a party to the suit, because of:

"[t]he critical fact . . . that in instituting and prosecuting those proceedings the United States was asserting an interest of its own separate and distinct from that of the plaintiff in the original action.

The interest of the United States was the sovereign's independent concern for preserving the integrity of its courts and vindicating their authority."

But this alone does not convert the United States from an *amicus curiae* into a party. A traditional function of an *amicus* is to assert "an interest of its own separate and distinct from that of the [parties]," whether that interest be private or public. It is "customary for those whose rights [depend] on the outcome of cases . . . to file briefs *amicus curiae,* in order to protect their own interests." Wiener, Briefing and Arguing Federal Appeals, 269 (1961). This Court has recognized the power of federal courts to appoint *"amici* to represent the public interest in the administration of justice." *Universal Oil Products Co.* v. *Root Rfg. Co.,* 328 U. S. 575, 581. In this case the Government was serving essentially in that capacity. Its ultimate interest—securing compliance with the courts' orders requiring Meredith's admission—was identical with the interest of the private plaintiff, and it was invited by the court to render necessary aid in that direction.

The Government's argument thus goes too far. "After all, a federal court can always call on law officers of the United States to serve as *amici"* "to represent the public interest in the administration of justice." *Ibid.* The Government has "an interest of its own" in vindicating its authority in every instance where the orders of its courts are violated, no matter how private or insignificant the suit. (This is evidenced by the fact that criminal contempt proceedings are typically prosecuted by the sovereign, not the private litigant.) In this respect every criminal contempt proceeding is actually (or at least potentially) a "suit or action brought or prosecuted in the name of, or on behalf of, the United States." Such a reading would, of course, make the statute a dead letter. It would bestow no "right" to a jury trial at all.

We are dealing here with a remedial statute broadly designed to afford the right to a jury trial in all but a narrowly limited category of contempts constituting violations of criminal statutes. Accordingly, the statute should be construed to effectuate its basic purpose, and its exemptions should not be unduly expanded by judicial construction. The Government concedes that the precise problem involved here—the United States entering a private litigation as *amicus curiae* and obtaining the order allegedly violated—"did not arise in the course of the legislative history." In my view, therefore, since a reading of the statute inclines against applying the exception here, and since there are no countervailing policy considerations, the statutory exemption should be read so as not to apply to the defendants.

The foregoing satisfies me that the alleged contempt was of an order of a District Court; that the alleged acts also constitute a criminal violation under an Act of Congress; that the relevant order was not entered in a suit or action brought or prosecuted in the name of, or on behalf of, the United States; and that, accordingly, defendants are entitled to a jury trial pursuant to 18 U. S. C. § 3691. Insofar as there may be lingering doubts concerning the application of that statute to the circumstances here, I would resolve those doubts in favor of the statutory right to a jury trial in order to avoid the grave constitutional questions inherent in the practice of punishing contempts such as the one here charged without trial by jury. Since the Court has not accepted this statutory analysis, I must consider these constitutional questions.

## B. The Constitutional Right to a Jury Trial.

The Court, in denying defendants' constitutional claim to a jury trial, rests on the history of criminal contempts relied on in its past decisions. The most recent of these decisions is *Green* v. *United States*, 356 U. S. 165,

which was decided by a closely divided Court.[7] The Court said:

"The principle that criminal contempts of court are not required to be tried by a jury under Article III or the Sixth Amendment is firmly rooted in our traditions." *Id.*, at 187.

"Against this historical background [of the power to punish criminal contempts summarily at the time of the Constitution], this Court has never deviated from the view that the constitutional guarantee of trial by jury for 'crimes' and 'criminal prosecutions' was not intended to reach to criminal contempts." *Id.*, at 186.

A review of the original sources convinces me, however, that the history relied on by the decisions of this Court does not justify the relatively recent practice of imposing *serious* punishment for criminal contempts without a trial by jury. My research, which is confirmed by the authorities cited in the Appendix to the opinion of the Court, suggests the following explanation as to why criminal contempts were generally tried without a jury at the time of the Constitution: the penalties then authorized and imposed for criminal contempts were generally minor; and the courts were authorized to impose minor criminal penalties without a trial by jury for a variety of trivial offenses including, but not limited to, criminal contempts.

### 1. *Criminal Contempts at About the Time of the Constitution.*

In 1821, this Court recognized that there were "known and acknowledged limits of fine and imprisonment" for

---

[7] In *Green* v. *United States*, 356 U. S. 165, "petitioners [did] not [contend] that they were entitled to a jury trial." *Id.*, at 187. The Court did, however, explicitly consider the issue.

criminal contempt. *Anderson* v. *Dunn*, 6 Wheat. 204, 228.[8] What these limits were at about the time of the Constitution can best be derived from the contemporary statutory and case law.

When the Bill of Rights was ratified, at least five of the original 13 States had specific statutory limitations on the punishment which could be imposed summarily for criminal contempts. The Connecticut statute permitting summary punishment for certain types of contempts contained a proviso "[t]hat no single minister of justice shall inflict any other punishment [for criminal contempt than] . . . putting them in the stocks, there to sit not exceeding two hours; or imposing a fine, not exceeding *five dollars*."[9] (Emphasis in original.) The Delaware statute permitted a contemner to "be fined in any sum not exceeding Five Pounds"; it did not permit imprisonment for criminal contempt.[10] The Maryland statute per-

---

[8] See *United States* v. *Duane*, 25 Fed. Cas. 920, No. 14,997 (1801): "We confine ourselves within the ancient limits of the law [of criminal contempt], recently retraced by legislative provisions and judicial decisions." At 922.

[9] An Act Concerning Delinquents, May 1667, 1 Conn. Pub. Stat. Laws (1808), 231–232. The statute also permitted "imprisonment, binding to the peace or good behaviour to the next county court." *Id.*, at 231. (County courts met twice annually, see *id.*, at 208.) This was apparently a civil contempt sanction permitting imprisonment only until the contemptuous conduct terminated, limited in any event to about six months. The criminal contempt section was part of a more general title which permitted a judge to try "any matter of a criminal nature . . . where the penalty does not exceed the sum of *seven dollars*." (Emphasis in original.) *Id.*, at 230.

[10] An Act against drunkenness, etc., apparently enacted in 1737. 1 Laws of Del. (1797), 173. The criminal contempt section is part of a general statute permitting trial without a jury for a number of petty offenses, *e. g.*, "drunkenness" (five shillings); "prophane cursing and swearing" (five shillings and three hours in the stocks); blasphemy (two hours in the pillory "and be branded in his or her forehead with the letter B, and be publicly whipt, on his or her bare back, with thirty-nine lashes well laid on"). *Id.*, at 173–174.

mitted the court to hold the contemner "in close custody until the said process, rule or order, shall be fully performed . . ." (civil contempt), but it permitted no punishment "exceeding ten pounds current money." [11] The New Hampshire provision permitted imprisonment for contempt not exceeding 10 days and a fine "not to exceed ten pounds." [12] The South Carolina statute permitted a fine not exceeding 10 pounds for any contempt "by word or gesture," and a fine "at the discretion of the said court," for anyone who shall "strike or use any violence in the said courts"; [13] it did not permit imprisonment. [14]

---

[11] Act of Nov. 1785, Chapter LXXII, I Md. Laws (Maxcy 1811), 595–596.

[12] Act of Feb. 9, 1791, N. H. Constitution and Laws (1805), 95. See *id.*, at 9. See also N. H. Acts and Laws (1696–1725), 15.

[13] Act of 1731, No. 552, Grimke's Laws of South Carolina (1790), 129. It is unclear whether this discretion was limited by decisional or statutory law.

[14] Although finding no general statutory limitation on the punishment which could be imposed for criminal contempt in Massachusetts, I have found the following data which suggest that the punishments there imposed were probably not out of line with those imposed in the other Colonies. See 1 Mass. Acts and Resolves (1692–1714), 282–283, Act of June 18, 1697, limiting to 10 shillings the punishment which could be imposed by a justice of the peace for criminal contempt in refusing to obey a summons; *id.*, at 335, Act of June 22, 1698, limiting to 40 shillings the punishment which any court could impose upon jurors who refused to obey a summons; *id.*, at 354–355, Act of Dec. 10, 1698, limiting to 40 shillings (or imprisonment for 48 hours, or "by setting in the stocks not exceeding four hours") the punishment for disobeying the order of a justice of the peace to assist in apprehending an offender. See also *Case of John Matthews*, cited in Colonial Justice in Western Massachusetts (1639–1702): The Pynchon Court Record (1961), 243 (fine of five shillings for "refusinge to obey a summons"; "contemptuous and high carriage"; "commanding [the server of the summons] off his ground and holding up his sickle at him . . ."); *Case of Samuell Fellowes, id.*, at 271 (1671) (fine of five pounds for "contemptuous carriage in Corte");

Within a short time after the ratification of the Bill of Rights other States enacted statutes containing specific limitations on the punishments which could be imposed summarily for criminal contempts. These statutes, which appear to be codifications of existing practices and court decisions rather than newly created legislative limita-

---

*Case of James Carver, id.*, at 288 (1678) (fine of 60 shillings for "horible abusive Cariage," including threats, striking the constable with his fist and "saying he would kill him and beate out his Braines etc."). But see *Thwing* v. *Dennie*, Quincy's Reports (Mass. 1761–1772), 338 (committed to prison for a period of time not specified in the court's opinion for "in a most savage Manner attempt[ing] to snatch" papers from the hands of his courtroom opponent, thereby tearing some essential documents); Act of Oct. 20, 1663, Mass. Colonial Laws (1672), 133, relating to the payment of fines for "Prophanation of the Sabbath, Contempt or Neglect of Gods publick Worship." The Act provides that: "in case any person or persons so sentenced, do neglect or refuse to pay such Fine or Mulcts as shall be legally imposed on them, or give Security in Court . . . every such person or persons so refusing or neglecting to submit to the Courts Sentence, shall for such his Contempt be Corporally punished, according as the Court that hath cognizance of the case shall determine: And where any are Corporally punished, their fines shall be remitted." Compare the penalties sometimes imposed by the "Court" of Assistants of Massachusetts Bay Colony, which was a legislative and executive body as well as a judicial tribunal (cases cited in the Appendix to the opinion of the Court, *ante*, at 711–712).

Although finding no colonial statute designating the punishment for criminal contempt in Maine, I have found a rule of court promulgated in 1649 which states that contemners "shalbe fined according unto the discretion of the Court." 1 Maine Province and Court Records 137. I have found no rule permitting imprisonment for criminal contempt.

In 1647, the Rhode Island General Assembly enacted a statute prohibiting the "use [of] words of contempt against a chief officer, especially in the execution of his office . . . ." The penalty for this offense was being "bound to his good behavior, so to remain for three months space, or the next court following." Trial was by a jury of "his peers," and not by summary proceeding. R. I. Code of Laws (1647) 24. Cf. *id.*, at 52.

tions,[15] shed additional light on the practice at about the time of the Constitution.

The New Jersey statute permitted a contemner to be punished by a fine "not exceeding fifty dollars." [16]   The

[15] See, *e. g., Case of Theunis Thew* (N. Y. Supreme Court, 1763), in Goebel and Naughton, Law Enforcement in Colonial New York (1944), 243 (fine of 200 pounds for contempt in refusing to answer questions); *Case of William Dobbs and William Paulding* (N. Y. Supreme Court, 1764), *ibid.* (fine of 200 pounds for contempt in refusing to answer questions); *Case of John Mosier* (Suffolk Court of Oyer and Terminer, 1717), *id.,* at 606 ("John Mosier [was ordered to be] committed into ye sheriffs Custody and to suffer a weeks Imprisonment for affronting the Kings Justices in Going to Hold court." He was released, however, the following day); *King* v. *Mary Richardson* (N. Y. Kings County Court, 1693), *id.,* at 605 (unspecified fine for unspecified contempt); *King* v. *Tiebout* (N. Y. Court of Quarter Sessions, 1695), *ibid.* (unspecified fine for unspecified contempt); *Case of John Tenbroek* (N. Y. Supreme Court, 1729), *id.,* at 606 (fine of 10 pounds for contempt in "having privately given victuals to the jury"); *Feree* v. *Strome,* 1 Yeates 303 (Pa. 1793) ("reprimanded . . . [and] dismissed without any fine" for failing to respond to subpoena); *Respublica* v. *Oswald,* 1 Dall. 343 (Pa. 1788) (imprisonment for one month and fine of 10 pounds for contempt by publication); *Territory* v. *Thierry,* 1 Martin 55 (La. 1810) (imprisonment for 10 days and fine of $50 for "grossly and indecently abusive" contempt by publication); *State* v. *Noel,* T. U. P. Charlton's Reports 43, 65 (Ga. 1806) (fines of $50 and $10 for "contempts in disobeying the order of" the Superior Court); *Case of Priest and Bonet* (1702), cited in Scott, Criminal Law in Colonial Virginia (1930), 173 (three hours in stocks for fighting near the court); *Case of Thomas Smith* (1697), *ibid.* (one hour in stocks for threatening the foreman of a jury); *Case of Matthew Kelley* (1773), *id.,* at 174 (fined five pounds for refusal to obey a warrant); *Case of Mary Russell* (Oct. 6, 1703), cited in *id.,* at 172 (ordered to jail until she gave bond for future good behavior for claiming that she had "received as little justice as she would have in hell with the devil sitting as judge"); *State* v. *Stone,* 3 Harris and McHenry's Reports (Md. 1792), 115 (fine of 20 shillings against

Kentucky statute specified that "[n]o court or judge shall, for any contempt against such court or judge, pass judgment for, decree, order or inflict, or cause to be inflicted,

a lower court judge for refusing to obey the mandate of a higher court); *State* v. *Keene,* 11 La. 596, 601 (fine of $50 and imprisonment "during the space of ten days," for a contempt described by the court in the following terms: "We do not remember a case of grosser contempt, and we doubt whether any are to be found in the books." The annotation of the official court reporter states that "The maximum punishment for a contempt of court, committed by a party to a suit, is ten days imprisonment, and a fine of fifty dollars and the costs." *Id.,* at 596). *Monroe* v. *Harkness,* 1 Cranch C. C. (1803), 157–158 (imprisonment for six days for violating an injunction); *United States* v. *Caton,* 25 Fed. Cas. 350, No. 14,758 (1803) (fine of $5 and ordered to give security of $100 for his good behavior, for refusing to answer questions, behaving in an "insolent manner," and threatening "some of the grand jurors"); *Case of John Rousby,* Proceedings of the Provincial Court of Md. (1675), Arch. of Md. LXV 585 (fine of 100 pounds of tobacco for contemptuous speech by an attorney in court); *Case of John Cherman,* Proceedings of the Charles County Court of Md. (1660), Arch. of Md. LIII 84 (fine of 10 pounds of tobacco for contempt in "Prophainly takinge the name of god in vaine in Open Courte"); *Case of Jon Seybrey,* Proceedings of the Chancery Court of Md. (1669), Arch. of Md. LI 8 (fine of 12 shillings, sixpence for failure to respond to summons); *Case of Lewis Morrice* (New Jersey Court of Common Right, 1698), I Journal of the Courts of Common Right and Chancery of East New Jersey, 1683–1702, 311 (fine of 50 pounds for resisting arrest and denying the authority of the court); *United States* v. *Duane,* 25 Fed. Cas. 920, No. 14,997 (1801) (imprisonment for 30 days for aggravated contempt by publication); *United States* v. *Emerson,* 25 Fed. Cas. 1012, No. 15,050 (1831) (fine of $5 for fighting and shouting in court); *United States* v. *Carter,* 25 Fed. Cas. 313, No. 14,740 (1829) (fine of $1 for threatening a witness); *Weiberg* v. *The St. Oloff,* 29 Fed. Cas. 591, No. 17,357 (1790) (fine of $20 for "refusing to obey the process of the court, and in confining in irons a suitor whilst under the protection of the laws . . ."). See also additional authority cited in the Appendix to the opinion of the Court.

[16] Act of June 13, 1799, Elmer, Digest of N. J. Laws (1838), 59.

any fine exceeding the sum of ten pounds, nor any imprisonment exceeding one day, *without the trial by jury to assess the quantity of such fine, and determine the duration of such imprisonment."* [17]  The Pennsylvania statute permitted an unspecified fine and if the contemner "shall be unable to pay such fine, such person may be committed to prison by the court for any time not exceeding three months." [18]  The New York statute permitted a maximum fine of $250 and imprisonment for 30 days in summary proceedings for criminal contempts.[19]

The Alabama criminal contempt statute declared that:

> *"whereas,* the trial by jury in all penal, as well as criminal cases, is both a safe and adequate mode of investigation and decision, and should only be suspended in cases of absolute necessity.  *Be it enacted,* that no court shall, for any contempt against such court, . . . inflict . . . any fine exceeding the sum of twenty dollars, nor any imprisonment exceeding twenty-four hours, without the trial by jury, to assess the amount of such fine, and determine the duration of such imprisonment." [20]

The Virginia statute was quite detailed.  It contained the following proviso:

> "That no court shall, without the intervention of a jury, for any such contempt of misbehaviour in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice

---

[17] Act of Dec. 19, 1793, 1 Digest of the Stats. of Ky. (1822), 301. (Emphasis added.)

[18] Act of Apr. 3, 1809, Laws of Pa. (1808–1812), 55–56.

[19] N. Y. Rev. Stats. (1829), 276, 278.  More extensive punishment was permitted upon indictment and trial by jury.

[20] Territorial Act of 1807, Aikin's Digest of the Laws of Ala. (1833–1835 Supp.), 87–88.

therein, impose any fine on any person or persons, exceeding fifty dollars, or commit him, her or them, for a longer period than ten days: *And provided,* That in any case of aggravated contempt . . . , the court may impannel a jury, without any indictment, information or pleadings, in a summary manner, to ascertain the amount of fine or term of imprisonment, proper to be inflicted for such offence, and may impose the fine or imprisonment ascertained by the jury in manner aforesaid." [21]

The laws of other States similarly limited the maximum penalties which could be imposed summarily for criminal contempts.[22]

-----

[21] Act of Apr. 16, 1831, Supp. to the Rev. Code of Va. (1833), 144. The Appendix to the opinion of the Court correctly notes that the punishment sanctioned for other categories of contempt within this statute—violence or threats of violence to judges, witnesses or jurors, misbehavior of court officers, and disobedience of a court order—was not specifically limited. *Ante,* at 723.

At the time of the enactment of this and similar statutes, there were generally no factual disputes for resolution by a jury in criminal contempt cases; for if the alleged contemner denied under oath the factual allegations against him, the contempt charge was dismissed, and he was subject to indictment for perjury. See, *e. g.,* Curtis and Curtis, The Story of a Notion in the Law of Criminal Contempt, 41 Harv. L. Rev. 51, 63–64; 4 Blackstone, Commentaries, 288; *Wells* v. *Commonwealth,* 21 Grattan's Rep. (Va. 1871), 500.

"Contempt of court was sharply reproved [in Colonial Virginia]. The least that was required was an open apology, and the court often added a fine, or commitment to prison, usually to last until bond for good behavior was furnished. Sometimes an hour or two in the stocks was prescribed." Scott, Criminal Law in Colonial Virginia (1930), 171–172.

[22] *E. g.,* Rev. Stats. of Mich. (1846), Tit. XXI, c. 96, pp. 428–430 (30 days' imprisonment, $250 fine); Chase, Stats. of Ohio (1788–1833), c. 823, §§ 49, 53, pp. 1701–1702 (fine of $200); Iowa Code (1850–1851), Tit. 18, c. 94, § 1600, p. 237 (one day's imprisonment, $50 fine); Wis. Rev. Stats. (1849), c. 87, § 8, p. 439 (30 days' im-

The available evidence of the practice in criminal contempt cases also suggests that punishments were trivial.[23]  This practice was described by Chief Justice Kent in 1809 as follows: "There is no such thing as an abuse of this power in modern times.  The case probably is not to be found.  An alarm cannot be excited at its existence, in the extent now laid down. . . .  The tendency of the times, is rather to induce the courts to relax, than increase in the severity of their ancient discipline, to exercise their power over contempts with extreme moderation . . . ." *In the case of John V. N. Yates*, 4 Johnson's Rep. (N. Y. 1809) 317, 375–376.  And, in 1916, the Supreme Court of Iowa summarized a century

---

prisonment, $250 fine); Mo. Rev. Stats. (1835), Act of Mar. 7, 1835, § 58, p. 160 (10 days' imprisonment, $50 fine); Minn. Terr. Rev. Stats. (1851), c. 92, § 12, p. 456 (six months' imprisonment, $250 fine); Miss. Stats. (1840), c. 40, § 26, p. 486 (imprisonment during "the term of the court at which the contempt shall have been committed"; courts held two terms annually; $100 fine); Thomson's Digest of the Laws of Fla. (1847), 3d Div., Tit. I, c. 1, § 2, p. 321 (30 days' imprisonment, $100 fine); Ark. Stats. (1837), c. 43, § 38, pp. 234–235 (10 days' imprisonment, $50 fine); Battle's Revisal, Pub. Stats. of N. C. (1873), Act of 1868, c. 24, § 2, p. 257 (imprisonment for 30 days, fine of $250); Laws of Vt. (1824), Act of Nov. 11, 1818, c. 31, § 27, p. 259 (fine of $200).

Cf. Georgia Stats. (Feb. 1799), an Act to amend an Act, entitled "An act to revise and amend the Judiciary System of this State," § 26, p. 30, limiting the punishment which courts may impose "in case of a jury committing a contempt" to "a sum not exceeding one hundred dollars."  See also § 20, p. 26, providing for "an attachment against . . . defaulting witness" and limiting the punishment to $300.  See also Georgia Stats. (1851) 647, Act of Dec. 14, 1811, § XXVII, limiting the punishment which could be imposed by justices of the peace for criminal contempts to "any sum not exceeding $2, or imprisonment for a term not exceeding two days for each offence . . . ."

[23] See, *e. g.*, cases cited, *supra*, note 14.

and a quarter of practice in criminal contempt cases in the following terms:

> "The authorities may be searched in vain for any precedent under our constitutional form of government holding it to be in the power of a state to clothe its courts with authority to visit infamous punishment upon any person for contempt, or in any proceeding whatever other than the orderly process of trial . . . ." *Flannagan* v. *Jepson,* 177 Iowa 393, 400, 158 N. W. 641, 643–644.

### 2. *Petty Offenses at About the Time of the Constitution.*

This Court has recognized that:

> "At the time of the adoption of the Constitution there were numerous offenses, commonly described as 'petty,' which were tried summarily without a jury, by justices of the peace in England, and by police magistrates or corresponding judicial officers in the Colonies, and punished by commitment to jail, a workhouse, or a house of correction." *District of Columbia* v. *Clawans,* 300 U. S. 617, 624.

New Jersey statutes, for example, permitted trial by a judge for offenses such as "profanely swearing" (punishable by a fine of "one half of a dollar," four hours in the stocks, or four days in the "common gaol"); "excessive use of spirituous, vinous, or other strong liquor" (fine of one dollar, four hours in the stocks, or four days in "gaol"); [24] and disorderly conduct (three months in the workhouse).[25] In New York, trial by jury was not

---

[24] Elmer's Digest of N. J. Law (1838), Act of Mar. 16, 1798, §§ 8–11, pp. 588, 589.

[25] Paterson's Laws of N. J. (1800) 410. See also *id.,* at 329, 333.

required for offenses such as unlicensed practice by a physician (fine of five pounds); [26] offering copper coins of known inferior quality or weight (fine of six pounds or five times the value of the coins, whichever is less); [27] "drunkenness or swearing" (fine of three shillings or four hours in the stocks); [28] and false pretenses (imprisonment for six months).[29] Maryland statutes permitted trial by a judge for offenses such as refusal by the mother of a bastard child to "discover" the father (fine of 30 shillings),[30] and disorderly conduct (three months in the workhouse).[31] Virginia permitted summary punishment for offenses ranging from improper issuing of notes (fine of 25 shillings)[32] to disorderly conduct (20 lashes and three months' imprisonment).[33]

This history has led the Court to conclude that "the intent [of the Framers] was to exclude from the constitutional requirement of a jury the trial of petty criminal offenses." *Schick* v. *United States*, 195 U. S. 65, 70. It has similarly led the Court to conclude that "[e]xcept in that class or grade of offences called petty offences . . . the guarantee of an impartial jury to the accused in a criminal prosecution . . . secures to him the right to enjoy that mode of trial from the first moment, and in whatever court, he is put on trial for the offence charged," *Callan* v. *Wilson*, 127 U. S. 540, 557, and that "the severity of the penalty" must be considered in determining whether a violation of law, "in other respects trivial and not a crime

---

[26] 4 Colonial Laws of N. Y. (1760) 455.

[27] 1787 Laws (N. Y.), c. 97.

[28] 1 Colonial Laws of N. Y. (1708) 617.

[29] 1785 Laws (N. Y.), cc. 31, 40, 47.

[30] 1752 Md. Sess. Laws, 5.

[31] 1785 Md. Sess. Laws, c. 15, § 15.

[32] Act of Oct. 1777, c. 24, § 2.

[33] 1785 Va. Stats. (Oct. Sess.), c. 1, § 8; c. 4, § 3; c. 59; 1787 Va. Stats. (Oct. Sess.), c. 48, § 13.

at common law, must be deemed so serious as to be comparable with common law crimes, and thus to entitle the accused to the benefit of a jury trial prescribed by the Constitution." *District of Columbia* v. *Clawans,* 300 U. S. 617, 625.

### 3. *Criminal Contempt in Recent Years.*

There has been a dramatic increase in recent years in the severity of the punishment imposed in the federal courts without trial by jury for criminal contempt. For example, in *Green* v. *United States, supra,* and *Collins* v. *United States,* 269 F. 2d 745, sentences of imprisonment for three years were imposed; in *Piemonte* v. *United States,* 367 U. S. 556, a sentence of imprisonment for 18 months was imposed; in *Brown* v. *United States,* 359 U. S. 41, a sentence of imprisonment for 15 months was imposed; in *Nilva* v. *United States,* 352 U. S. 385, a sentence of imprisonment for one year and one day was imposed; and in *Levine* v. *United States,* 362 U. S. 610, a sentence of imprisonment for one year was imposed.

### 4. *Historical Conclusions.*

The available evidence seems to indicate that (a) at the time of the Constitution criminal contempts triable without a jury were generally punishable by trivial penalties, and that (b) at the time of the Constitution all types of "petty" offenses punishable by trivial penalties were generally triable without a jury. This history justifies the imposition without trial by jury of no more than trivial penalties for criminal contempts. The Court, in light of the history reviewed here and in the Appendix to the opinion of the Court, has failed sufficiently to take into account the possibility that one significant reason why criminal contempts were tried without a jury at the time of the Constitution was because they were

deemed a species of petty offense punishable by trivial penalties.[34] Since criminal contempts, as they are now punished, can no longer be deemed a species of petty offense punishable by trivial penalties, defendants' constitutional claim to trial by jury should not be denied on the authority of the history of criminal contempt at the time of the Constitution nor on the authority of the past decisions of this Court which relied on that history.[35]

---

[34] See *Green* v. *United States,* 356 U. S. 165, 209–210 (dissenting opinion of Mr. Justice Black):

"I find it difficult to understand how it can be maintained that the same people who manifested such great concern for trial by jury as to explicitly embed it in the Constitution for every $20 civil suit could have intended that this cherished method of trial should not be available to those threatened with long imprisonment for the crime of contempt. I am confident that if there had been any inkling that the federal courts established under the Constitution could impose heavy penalties, as they now do, for violation of their sweeping and far-ranging mandates without giving the accused a fair trial by his fellow citizens it would have provoked a storm of protest, to put it mildly. Would any friend of the Constitution have been foolhardy enough to take the floor of the ratifying convention in Virginia or any of a half dozen other States and even suggest such a possibility?"

[35] The "historical error" on which the imposition of serious penalties for criminal contempts without a jury trial rests is not of the same character or duration as the "historical error" discussed in *Green* v. *United States, supra,* at 185, 190, 202. There the alleged "error" occurred before the adoption of the Constitution and has been a part of English and American law for almost two centuries. The Court was not prepared to overturn "at least two score cases in this Court." *Id.,* at 190. Here the "error" has only recently become manifest and has never been explicitly legitimated by this Court.

The imposition of serious penalties for criminal contempts is a relatively recent phenomenon. From the foundation of the Republic until 1957 I am aware of only two isolated instances of imprisonment for longer than six months for criminal contempt brought to the attention of this Court. *In re Savin,* 131 U. S. 267 (one year); *Hill* v. *United States ex rel. Weiner,* 300 U. S. 105 (two years). Since

Their claim should be evaluated by analyzing the real nature of criminal contempts and applying the policy of the constitutional requirement of trial by jury in "all crimes" and "all criminal prosecutions." [36]

### 5. *The Nature of Criminal Contempts and the Policy of Trial by Jury.*

I wish to make it clear that I am not here concerned with, nor do I question, the power of the courts to com-

1957, however, our attention has been called to at least six instances where imprisonment of a year or more was imposed. *Nilva* v. *United States,* 352 U. S. 385 (one year and one day); *Yates* v. *United States,* 355 U. S. 66 (one year); *Green* v. *United States,* 356 U. S. 165 (three years); *Brown* v. *United States,* 359 U. S. 41 (15 months); *Levine* v. *United States,* 362 U. S. 610 (one year); *Piemonte* v. *United States,* 367 U. S. 556 (18 months). By holding that no nontrivial penalty may be imposed for criminal contempt without a trial by jury, we would be correcting a fundamental, but only recently manifested, historical error.

[36] An analogous situation is presented by the criminal enforcement of the laws relating to the sale and taxation of liquor. At the time of the Constitution violations of the liquor laws of the various States generally carried with them trivial penalties and were deemed petty offenses, triable without a jury. *E. g.,* failure to pay tax, see Pa. Laws of 1712–1713, c. 195, § 2 (five-pound fine); Pa. Laws of 1719, c. 239, § 4 (20-shilling fine); 1756 Md. Sess. Laws, 12 (20-pound fine); unlicensed sale of liquor, see New York Laws of 1781, c. 27 (10-pound fine); 1757 Md. Sess. Laws, 6 (30-shilling fine); selling liquor above price fixed, see Pa. Laws of 1718, c. 235 (40-shilling fine); selling liquor to minors or slaves, see Pa. Laws of 1721, c. 244, § 3 (five-pound fine for third offense); Md. Laws 1735, Arch. of Md. XXXIX 292 (10-shilling fine); or at prohibited places, see 4 Colonial Laws of New York (1768), c. 1380 (five-pound fine). Now, however, violations of at least some liquor laws are punished so severely that they cannot be deemed trivial offenses. Certainly no one would argue that it is constitutionally permissible to impose without trial by jury severe punishments for violation of these laws simply because trivial punishments were imposed without trial by jury at the time of the Constitution for violation of similar or even identical laws. See *District of Columbia* v. *Clawans,* 300 U. S. 617, 625.

pel compliance with their lawful orders by the imposition of conditional punishment—commonly referred to as civil contempt. In such cases, it may be said that "the defendant carries the keys to freedom in his willingness to comply with the court's directive. . . ." [37] Nor am I here concerned with the imposition of the trivial punishments traditionally deemed sufficient for maintaining order in the courtroom. Cf. *Ungar* v. *Sarafite, ante,* p. 575. I am concerned solely with the imposition, without trial by jury, of fixed nontrivial punishments *after* compliance with the court's order has been secured.

Thus limited, criminal contempts are not essentially different from other "crimes" or "criminal prosecutions." In each case punishment is imposed for a past violation of a mandate of a coordinate organ of government: [38]

---

[37] "Such coercion, where the defendant carries the keys to freedom in his willingness to comply with the court's directive, is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees. See *United States* v. *United Mine Workers of America,* 330 U. S. 258, 330–332 (dissenting and concurring opinion). Instead, at stake here is the validity of a criminal conviction for disobedience of a court order punished by a long, fixed term of imprisonment. In my judgment the distinction between conditional confinement to compel future performance and unconditional imprisonment designed to punish past transgressions is crucial, analytically as well as historically, in determining the permissible mode of trial under the Constitution." *Green* v. *United States, supra,* at 197–198 (dissenting opinion of MR. JUSTICE BLACK). But see Goldfarb, The Contempt Power (1963), 49–67.

[38] "Under the Constitution courts are merely one of the coordinate agencies which hold and exercise governmental power. Their decrees are simply another form of sovereign directive aimed at guiding the citizen's activity. I can perceive nothing which places these decrees on any higher or different plane than the laws of Congress or the regulations of the Executive insofar as punishment for their violation is concerned. . . . Unfortunately judges and lawyers have told each

criminal contempt involves punishment for violation of an order of a court; "crime" involves punishment for violation of a statute enacted by a legislature.[39]  I can see no greater need for certain and prompt punishment for the former than for the latter.[40]

It may be true that a judge can dispose of a charge of criminal contempt, or any other criminal charge, more expeditiously and more cheaply than a jury.

> "But such trifling economies as may result have not generally been thought sufficient reason for abandoning our great constitutional safeguards aimed at protecting freedom and other basic human rights of incalculable value.  Cheap, easy convictions were not the primary concern of those who adopted the Constitution and the Bill of Rights.  Every procedural safeguard they established purposely made it more difficult for the Government to convict those it accused of crimes.  On their scale of values justice occupied at least as high a position as economy."  *Green* v. *United States, supra,* at 216.

Nor are criminal contempts substantially different from other crimes when measured by the "tests traditionally applied to determine whether [a given sanction] is penal or regulatory in character . . . ."  *Kennedy* v.

---

other the contrary so often that they have come to accept it as the gospel truth."  *Green* v. *United States, supra,* at 218–219 (dissenting opinion of MR. JUSTICE BLACK).

[39] In this case defendants' conduct is alleged to be a violation of both a court order and a legislative enactment.

[40] "I would go as far as any man in favor of the sharpest and most summary *enforcement* of order in Court and obedience to decrees, but when there is no need for immediate action contempts are like any other breach of law and should be dealt with as the law deals with other illegal acts."  *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 425–426 (dissenting opinion of Mr. Justice Holmes, concurred in by Mr. Justice Brandeis).  (Emphasis added.)

*Mendoza-Martinez,* 372 U. S. 144, 168. In the *Mendoza-Martinez* case, the tests were enumerated in the following terms:

"Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . ." *Id.,* at 168–169.

Criminal contempt, when punished by a nontrivial penalty, certainly "involves an affirmative disability or restraint" under any reasonable definition of these terms. The sanction imposed for criminal contempt has always been "regarded as a punishment" designed to deter future defiances of the court's authority and to vindicate its dignity.[41] No "alternative purpose" has been suggested to justify its existence. *Scienter* is generally required to support a charge of criminal contempt.[42] And the behavior to which a charge of criminal contempt applies is generally "already a crime." [43]

In my view, therefore, there is no justification, either in the history or policy of criminal contempt or in the history or policy of the Constitution, for treating criminal contempt differently from other "crimes" or "criminal prosecutions." If a criminal contempt (or any other

---

[41] See, *e. g.,* 4 Blackstone, Commentaries, pp. 283–285.

[42] See, *e. g., In re Rice,* 181 F. 217. *Scienter* was charged in this case, see Appendix A, *infra,* at 761.

[43] The behavior with which defendants are here charged is already a crime. *Ante,* at 729, 735–736.

violation of law) is punishable only by a trivial penalty, then the Constitution does not require trial by jury. If a violation of law is punishable by a nontrivial penalty, then the Constitution does require trial by jury whether the violation is labeled criminal contempt or anything else.[44]

### C. Application of the Constitutional Rule to the Facts of This Case.

It remains only to apply this conclusion to the facts here. Although the certified question does not specify

---

[44] I need not at this juncture consider what constitutes a trivial penalty. The Court considered this problem in *District of Columbia* v. *Clawans,* 300 U. S. 617. Respondent there was sentenced "to pay a fine of $300 or to be confined in jail for sixty days" for engaging in the business of selling secondhand property without a license, an offense "punishable by a fine of not more than $300 or imprisonment for not more than ninety days." *Id.,* at 623. The United States Court of Appeals for the District of Columbia in a unanimous *en banc* decision, noted that "[i]f, instead of three months in jail, the punishment provided were six months or a year, the problem would be simpler. So, also, if the punishment were, let us say, ten days in jail." It held, however, that imprisonment for three months "cannot be said to be petty or trivial." 66 App. D. C. 11, 14, 84 F. 2d 265, 268. That decision was reversed by a divided Supreme Court. The Court said: "[W]e may doubt whether summary trial with punishment of more than six months' imprisonment, prescribed by some pre-Revolutionary statutes, is admissible without concluding that a penalty of ninety days is too much." 300 U. S., at 627–628. The Court also cautioned:

"We are aware that those standards of action and of policy which find expression in the common and statute law may vary from generation to generation. Such change has led to the abandonment of the lash and the stocks, and we may assume, for present purposes, that commonly accepted views of the severity of punishment by imprisonment may become so modified that a penalty once thought to be mild may come to be regarded as so harsh as to call for the jury trial, which the Constitution prescribes, in some cases which were triable without a jury when the Constitution was adopted." *Id.,* at 627.

the severity of the punishment which could be imposed upon the defendants if the allegations against them are proved, it would defy reality to assume that the contempt with which they are charged is a "trivial" one punishable by a minor penalty. The Solicitor General of the United States described the nature of the contempt to this Court in oral argument in the following words:

> "[T]he Governor and Lieutenant Governor of a State sought to array the whole panoply of the State against a final adjudication by the federal courts. The contempt with which they are charged was rioting, loss of life, and the need for federal troops to uphold the law of the land . . . ."

One judge in the Court of Appeals said: "Never before has such a charge been brought by or in a Court of Appeals . . . against either a state officer or a private citizen." [45] The certified question indicates that "the acts charged as constituting the alleged disobedience were of a character as to constitute also a criminal offense . . . ," punishable by imprisonment for a year. 18 U. S. C. (Supp. IV) § 1509. Another judge in the Court of Appeals said that: "Respondents are charged with what amounts to a crime." 330 F. 2d, at 432. These indicia, taken together with the severity of the sanction imposed in the civil contempt case which grew out of the same conduct,[46] compel the conclusion that the contempt here charged was not "trivial." It was extraordinarily serious, among the most serious in this Nation's history. If Green's contempt—jumping bail—was punishable by im-

---

[45] 330 F. 2d 369, 393.

[46] The civil contempt judgment provided for a fine of $10,000 a day against Governer Barnett and $5,000 a day against Lieutenant Governor Johnson unless they complied with the court's order by a certain fixed time.

prisonment for three years, and if Piemonte's contempt—refusal to answer a question before a grand jury—was punishable for imprisonment for a year and a half,[47] it would be wholly unrealistic for us to assume that under the standards of punishment sanctioned by this Court in the past the present contempt may be characterized as a petty offense punishable by no more than a trivial penalty.[48] For these reasons, I would answer the certified question in the affirmative and remand the case to the District Court so that the accused may be tried by a jury and receive at a trial all the safeguards which our Constitution affords a criminal defendant.

In sum, therefore, I conclude that defendants' trial should be by a jury. This would accord with the basic policy of Congress, that contempts which are also crimes should be tried by a jury. And it would accord with the fundamental policy of the Constitution, that contempts which are punishable as crimes must be tried by a jury.[49]

I reject the Government's "necessity" argument, that "[t]he independence of the federal courts . . . would be seriously undermined if their orders could be nullified by an unsympathetic jury." That is but another way of putting the oft-rejected assertion against trial by jury, that some guilty men may be acquitted. This possibility, however, is the price we have chosen to pay for our cher-

[47] See *Green* v. *United States, supra,* and *Piemonte* v. *United States, supra.*

[48] The right to trial by jury depends not on the severity of the punishment actually imposed, but rather on the severity of the punishment which could legally have been imposed. *District of Columbia* v. *Clawans,* 300 U. S. 617, 623.

[49] An answer to the certified question does not prevent defendants, if they are convicted, from raising other issues, not included in the certificate, on appeal from their convictions.

ished liberties. "The imperative necessity for safeguarding these rights . . . under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit governmental action." *Kennedy* v. *Mendoza-Martinez*, 372 U. S., at 165. "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan*, 4 Wall. 2, 120–121.

## APPENDIX A TO OPINION OF MR. JUSTICE GOLDBERG, DISSENTING.

### COURT OF APPEALS' ORDER TO SHOW CAUSE.

This Court having entered an order on September 18, 1962, in the case of *James H. Meredith, et al* v. *Charles Dickson Fair, et al*, No. 19475, designating and authorizing the United States to appear and participate in that case as amicus curiae with the right to submit pleadings, evidence, arguments and briefs, and to initiate such further proceedings, including proceedings for injunctive relief, as might be appropriate in order to maintain and preserve the due administration of justice and the integrity of the judicial processes of the United States, and

The Attorney General having instituted, pursuant to this Court's order of September 18, 1962, an action in the name of and on behalf of the United States, as amicus curiae, which action was entitled *United States* v. *State of Mississippi, et al*, restraining the State of Mississippi and Ross R. Barnett, their agents, employees, officers, successors, and all persons in active concert or participa-

tion with them, from interfering with or obstructing the enjoyment of rights or the performance of duties under the order of this Court of July 28, 1962, in the case of *Meredith* v. *Fair,* and a similar order of the District Court for the Southern District of Mississippi in that case, requiring the enrollment of James H. Meredith at the University of Mississippi, and

This Court having ordered on November 15, 1962, that the Attorney General, and such attorneys in the Department of Justice as he may designate, be appointed to institute and prosecute criminal contempt proceedings against Ross R. Barnett and Paul B. Johnson, Jr., and

Probable cause having been made to appear from the application of the Attorney General filed December 21, 1962, in the name of and on behalf of the United States that on September 25, 1962, Ross R. Barnett, having been served with and having actual notice of this Court's temporary restraining order of September 25, 1962, wilfully prevented James H. Meredith from entering the offices of the Board of Trustees of the University of Mississippi in Jackson, Mississippi, and thereby deliberately prevented James H. Meredith from enrolling as a student in the University pursuant to this Court's order of July 28, 1962; that on September 26, 1962, Paul B. Johnson, Jr., acting under the authorization and direction of Ross R. Barnett, and as his agent and as an agent and officer of the State of Mississippi, and while having actual notice of the temporary restraining order of September 25, 1962, wilfully prevented James H. Meredith from entering the campus of the University of Mississippi in Oxford, Mississippi, and thereby deliberately prevented James H. Meredith from enrolling as a student in the University pursuant to the orders of this Court; that on September 27, 1962, Ross R. Barnett and Paul B. Johnson, Jr. wilfully failed to take such measures as were necessary to main-

tain law and order upon the campus of the University of Mississippi and did, instead, direct and encourage certain members of the Mississippi Highway Safety Patrol, Sheriffs and deputy Sheriffs and other officials of the State of Mississippi to obstruct and prevent the entry of James H. Meredith upon the campus of the University that day; that on September 30, 1962, Ross R. Barnett, knowing of the planned entry of James H. Meredith upon the campus of the University of Mississippi, knowing that disorders and disturbances had attended and would attend such entry, and knowing that any failure of the Mississippi Highway Safety Patrol to take all possible measures for the maintenance of peace and order upon the campus could and would result in interferences with and obstructions to the carrying out of the Court's order of July 28, 1962, wilfully failed to exercise his responsibility, authority, and influence as Governor to maintain law and order upon the campus of the University of Mississippi; and that all of said acts, omissions and conduct of Ross R. Barnett and Paul B. Johnson, Jr., were for the purpose of preventing compliance with this Court's order of July 28, 1962, and of the similar order of the United States District Court for the Southern District of Mississippi, entered on September 13, 1962, and were in wilful disobedience and defiance of the temporary restraining order of this Court entered on September 25, 1962,

IT IS ORDERED that Ross R. Barnett and Paul B. Johnson, Jr., appear before this Court in the courtroom of the United States Court of Appeals for the Fifth Circuit in New Orleans, Louisiana, on February 8, 1963, at 9:30 o'clock a. m., to show cause, if any they have, why they should not be held in criminal contempt, and should either of them at said time and place show such cause, either by pleading not guilty to the charges contained in the application of the United States, or by other means,

he shall thereafter appear before this Court for hearing upon said charges at a time and place to be fixed by the Court.

This 4th day of January, 1963.

ELBERT P. TUTTLE
RICHARD T. RIVES
WARREN L. JONES
JOHN R. BROWN
JOHN MINOR WISDOM
GRIFFIN B. BELL
*United States Circuit Judges*
*Fifth Circuit*

I Dissent—BEN F. CAMERON
*United States Circuit*
*Judge, Fifth Circuit*
I Dissent—WALTER P. GEWIN
*United States Circuit*
*Judge, Fifth Circuit*

## APPENDIX B TO OPINION OF MR. JUSTICE GOLDBERG, DISSENTING.

COURT OF APPEALS' INJUNCTION ORDER.

This Court on July 26, 1962 entered its opinion and judgment forthwith (1) vacating a stay issued herein by Judge Ben F. Cameron, July 18, 1962, (2) recalling its mandate issued herein July 17, 1962, (3) amending and reissuing its mandate, for the purpose of preventing an injustice, by ordering the District Court to issue forthwith an injunction against the defendants-appellees ordering the immediate admission of the plaintiff-appellant, James H. Meredith, to the University of Mississippi, (4) which opinion and judgment includes an order of in-

junction by this Court against the defendants-appellees herein.

Now therefore, the following injunctive order is issued:

## ORDER

Pending such time as the District Court has issued and enforced the orders herein required and until such time as there has been full and actual compliance in good faith with each and all of said orders by the actual admission of plaintiff-appellant to, and the continued attendance thereafter at the University of Mississippi on the same basis as other students who attend the University, the defendants, their servants, agents, employees, successors and assigns, and all persons acting in concert with them, as well as any and all persons having knowledge of the decree are expressly:

(1) Ordered to admit the plaintiff, James H. Meredith, to the University of Mississippi, on the same basis as other students at the University, under his applications heretofore filed, which are declared to be continuing applications, such admission to be immediate or, because of the second summer session having started, such admission to be in September, at Meredith's option, and without further registration,

(2) Prohibited from any act of discrimination relating to Meredith's admission and continued attendance, and is

(3) Ordered promptly to evaluate and approve Meredith's credits without discrimination and on a reasonable basis in keeping with the standards applicable to transfers to the University of Mississippi.

In aid of this Court's jurisdiction and in order to preserve the effectiveness of its judgment, this Court entered a preliminary injunction on June 12, 1962. The injunc-

tion was against Paul G. Alexander, Attorney for Hinds County, Mississippi, his agent, employees, successors, and all persons in active concert and participation with him and all persons who received notice of the issuance of the order, restraining and enjoining each and all of them from proceeding with the criminal action instituted against James H. Meredith in the Justice of the Peace Court of Hinds County, Justice District No. 5, or any other court of the State of Mississippi, charging that Meredith knowingly secured his registration as a voter in Hinds County but was a resident of Attala County, Mississippi. In further aid of this Court's jurisdiction and in order to preserve the continued effectiveness of its judgment and orders, the said preliminary injunction is continued against the same parties and all other parties having knowledge of this decree pending the final action of the United States Supreme Court if and when the defendants-appellees should apply for a writ of certiorari or for any other appropriate action in this cause by the United States Supreme Court.

It is further ordered that a copy of this order be served upon the defendants-appellees, through their attorneys, and upon Paul G. Alexander, County Attorney for Hinds County, Mississippi, and Joseph T. Patterson, Attorney General for the State of Mississippi.

Entered at New Orleans, Louisiana
    this 28th day of July, 1962.

> JOHN R. BROWN, JMW
> *United States Circuit Judge*
>
> JOHN MINOR WISDOM
> *United States Circuit Judge*
>
> DOZIER A. DEVANE, JMW
> *United States District Judge*

## APPENDIX C TO OPINION OF MR. JUSTICE GOLDBERG, DISSENTING.

### DISTRICT COURT'S ORDER GRANTING PERMANENT INJUNCTION.

This matter is now before this Court by virtue of the Mandate of the United States Court of Appeals for the Fifth Circuit and the Mandate of Mr. Justice Black of September 10, 1962 setting aside all stays granted by Judge Ben F. Cameron and putting into effect the mandates of the Court of Appeals for the Fifth Circuit enjoining the Trustees and officials of the University of Mississippi from taking any steps to prevent enforcement of the mandates of the Court of Appeals for the Fifth Circuit, and this Court having now considered the mandates of the Court of Appeals for the Fifth Circuit of July 17, 1962, July 27, 1962 and its final order of August 4, 1962, and this Court having considered the mandate of July 17, 1962 wherein the Court of Appeals reversed the judgment of the District Court with directions to this Court to issue an injunction as prayed for in the complaint and by its mandate of July 27, 1962 ordered that the judgment of that Court issued as and for the mandate on July 17, 1962, be recalled and amended by making explicit the meaning that was implicit as expressed in its opinion dated June 25, 1962 and ordering that this Court "forthwith grant all relief prayed for by the plaintiff and to issue forthwith a permanent injunction against each and all of the defendants-appellees, their servants, agents, employees, successors and assigns, and all persons acting in concert with them, as well as any and all persons having knowledge of the decree, enjoining and compelling each and all of them to admit the plaintiff-appellant, James H. Meredith, to the University of Mississippi under his applications heretofore filed, which are declared by us to be

continuing applications. Such injunction shall in terms prevent and prohibit said defendants-appellees, or any of the classes of persons referred to from excluding the plaintiff-appellant from admission to continued attendance at the University of Mississippi."

And by its mandate of August 4, 1962 the Court of Appeals reaffirmed its orders of July 17, 1962 and July 27, 1962 in the following language: "All of our orders of July 17, July 27 and this date, therefore continue in full force and effect and require full and immediate obedience and compliance."

Now, therefore, it is here ordered, adjudged and decreed that the plaintiff, James Howard Meredith, be and he is hereby granted all the relief that is prayed for by him in his complaint and that the defendants, Charles Dickson Fair, President of the Board of Trustees of State Institutions of Higher Learning of the State of Mississippi, Louisville, Mississippi; Euclid Ray Jobe, Executive Secretary of the Board of Trustees of State Institutions of Higher Learning of the State of Mississippi, Jackson, Mississippi; Edgar Ray Izard, Hazlehurst, Mississippi; Leon Lowrey, Olive Branch, Mississippi; Ira Lamar Morgan, Oxford, Mississippi; Malcolm Mette Roberts, Hattiesburg, Mississippi; William Orlando Stone, Jackson, Mississippi; S. R. Evans, Greenwood, Mississippi; Verner Smith Holmes, McComb, Mississippi; James Napoleon Lipscomb, Macon, Mississippi; Tally D. Riddell, Quitman, Mississippi; Harry Gordon Carpenter, Rolling Fork, Mississippi; Robert Bruce Smith, II, Ripley, Mississippi and Thomas Jefferson Tubb, West Point, Mississippi, Members of the Board of Trustees of State Institutions of Higher Learning; James Davis Williams, Chancellor of the University of Mississippi, Oxford, Mississippi; Arthur Beverly Lewis, Dean of the College of Liberal Arts of the University of Mississippi, Oxford, Mississippi, and

Robert Byron Ellis, Registrar of the University of Mississippi, Oxford, Mississippi, and each of them, their agents, servants, employees, successors, attorneys and all persons in active concert and participation with them be and they hereby are permanently restrained and enjoined from:

(1) Refusing to admit plaintiff, James Howard Meredith immediately to the University of Mississippi and that they shall each of them be, and they are hereby required to admit him to the University of Mississippi upon the same terms and conditions as applicable to white students;

(2) From interfering in any manner with the right of plaintiff, James Howard Meredith to matriculate in, or attend the University of Mississippi;

(3) From taking any action or doing any act or being guilty of any conduct which will impair, frustrate or defeat his right to enter the University of Mississippi;

(4) Refusing to admit the plaintiff, James Howard Meredith to the University of Mississippi upon his applications heretofore filed, all of which are continuing applications.

It is further ordered that said defendants, or any of the classes of persons referred to, are prohibited and enjoined from excluding the said James Howard Meredith from admission to continued attendance at the University of Mississippi.

It is further ordered that the defendants, their servants, agents, employees, successors and assigns, and all persons acting in concert with them, are enjoined to admit the plaintiff, James Howard Meredith to the University of Mississippi upon his applications heretofore filed and they are enjoined from excluding the said James Howard Meredith from admission to continued attendance at the University of Mississippi or discriminating against him in any way whatsoever because of his race.

It is further ordered that a copy of this order and injunction be served by the United States Marshal on each of the defendants herein.

ORDERED, this the 13th day of September, 1962.

S. C. MIZE
*United States District Judge*

## APPENDIX D TO OPINION OF MR. JUSTICE GOLDBERG, DISSENTING.

COURT OF APPEALS' TEMPORARY RESTRAINING ORDER.

This Court having entered its order in this action on July 28, 1962, and the District Court for the Southern District of Mississippi having entered a similar order on September 13, 1962, pursuant to the mandate of this Court, requiring the defendant officials of the University of Mississippi and the defendant members of the Board of Trustees of the Institutions of Higher Learning of the State of Mississippi to enroll James Howard Meredith as a student in the University of Mississippi, and

It appearing from the verified petition of the United States, *Amicus Curiae* herein, that the State of Mississippi, Ross R. Barnett, Governor of Mississippi, Joe T. Patterson, Attorney General of Mississippi, T. B. Birdsong, Commissioner of Public Safety of Mississippi, Paul G. Alexander, District Attorney of Hinds County, William R. Lamb, District Attorney of Lafayette County, J. Robert Gilfoy, Sheriff of Hinds County, J. W. Ford, Sheriff of Lafayette County, William D. Rayfield, Chief of Police of the City of Jackson, James D. Jones, Chief of Police of the City of Oxford, Walton Smith, Constable of the City of Oxford, the classes consisting of all district attorneys in Mississippi, the classes consisting of the sheriffs of all counties in Mississippi, the classes consisting of all chiefs of police in Mississippi, and the classes con-

sisting of all constables and town officials in Mississippi, threaten to implement and enforce, unless restrained by order of this Court, the provisions of a Resolution of Interposition adopted by the Mississippi Legislature, the provisions of Section 4065.3 of the Mississippi Code, and a Proclamation of Ross R. Barnett invoking the doctrine of interposition with respect to the enforcement of the orders of this Court in this case; that Paul G. Alexander has instituted two criminal prosecutions against James Howard Meredith on account of the efforts of James Howard Meredith to enroll in the University of Mississippi pursuant to the orders of this Court; that A. L. Meador, Sr., and the class of persons he represents, on September 19, 1962, instituted in the Chancery Court of the Second Judicial District of Jones County, Mississippi, a civil action against James Howard Meredith to prevent him from attending the University of Mississippi; that on September 20, 1962, James Howard Meredith, while seeking to enroll at the University of Mississippi in Oxford, Mississippi, pursuant to the orders of this Court, was served with a writ of injunction issued by the Chancery Court of Lafayette County, Mississippi, at the instance of Ross R. Barnett, enjoining James Howard Meredith from applying to or attending the University of Mississippi; that on September 20, 1962 the State of Mississippi enacted Senate Bill 1501, the effect of which is to punish James Howard Meredith should he seek enrollment in the University of Mississippi; that the effect of the conduct of the defendants herein named in implementing the policy of the State of Mississippi as proclaimed by Ross R. Barnett will necessarily be to prevent the carrying out of the orders of this Court and of the District Court for the Southern District of Mississippi; and that the acts and conduct of the defendants named in the petition will cause immediate and irreparable injury to the United States consisting of the impairment of the in-

tegrity of its judicial processes, the obstruction of the due administration of justice, and the deprivation of rights under the Constitution and laws of the United States, all before notice can be served and a hearing had,

IT IS ORDERED that the State of Mississippi, Ross R. Barnett, Joe T. Patterson, T. B. Birdsong, Paul G. Alexander, William R. Lamb, J. Robert Gilfoy, J. W. Ford, William D. Rayfield, James D. Jones, Walton Smith, the class consisting of all district attorneys in Mississippi, the class consisting of the sheriffs of all counties in Mississippi, the class consisting of all chiefs of police in Mississippi, and the class consisting of all constables and town marshals in Mississippi, their agents, employees, officers, successors, and all persons in active concert or participation with them, be temporarily restrained from:

1. Arresting, attempting to arrest, prosecuting or instituting any prosecution against James Howard Meredith under any statute, ordinance, rule or regulation whatever, on account of his attending, or seeking to attend, the University of Mississippi;

2. Instituting or proceeding further in any civil action against James Howard Meredith or any other persons on account of James Howard Meredith's enrolling or seeking to enroll, or attending the University of Mississippi;

3. Injuring, harassing, threatening or intimidating James Howard Meredith in any other way or by any other means on account of his attending or seeking to attend the University of Mississippi;

4. Interfering with or obstructing by any means or in any manner the performance of obligations or the enjoyment of rights under this Court's order of July 28, 1962 and the order of the United States District Court for the Southern District of Mississippi entered September 13, 1962, in this action, and

5. Interfering with or obstructing, by force, threat, arrest or otherwise, any officer or agent of the United States in the performance of duties in connection with the enforcement of, and the prevention of obstruction to, the orders entered by this Court and the District Court for the Southern District of Mississippi relating to the enrollment and attendance of James Howard Meredith at the University of Mississippi; or arresting, prosecuting or punishing such officer or agent on account of his performing or seeking to perform such duty.

IT IS FURTHER ORDERED that Paul G. Alexander and J. Robert Gilfoy be temporarily restrained from proceeding further, serving or enforcing any process or judgment, or arresting James Howard Meredith in connection with the criminal actions against him in the Justice of the Peace Court of Hinds County, Mississippi.

IT IS FURTHER ORDERED that A. L. Meador, Sr., be temporarily restrained from taking any further action or seeking to enforce any judgment entered in the case of *A. L. Meador, Sr.* v. *James Meredith, et al.*

IT IS FURTHER ORDERED that Ross R. Barnett be temporarily restrained from enforcing or seeking to enforce against James Howard Meredith, any process or judgment in the case of *State of Mississippi, Ex Rel Ross Barnett, Governor* vs. *James H. Meredith.*

ELBERT P. TUTTLE
*Circuit Judge*
RICHARD T. RIVES
*Circuit Judge*
JOHN MINOR WISDOM
*Circuit Judge*

Signed this 25th day of
September, 1962, at 8:30 A. M.